NOT DESIGNATED FOR PUBLICATION

No. 116,992

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RICHARD PAUL LANGSTON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; WESLEY K. GRIFFIN, judge. Opinion filed December 1, 2017. Affirmed.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Kayla L. Roehler*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., MCANANY and POWELL, JJ.

POWELL, J.: This case amply demonstrates the dangers of unchecked road rage. After another driver pulled in front of Richard Paul Langston, both drivers engaged in a dangerous interplay of threats and aggressive driving, culminating in Langston retrieving and pointing a sawed off shotgun at the other driver. For his actions, Langston was charged and convicted of two felonies—aggravated assault with a deadly weapon and criminal carrying of a shotgun with a barrel less than 18 inches in length. Langston now appeals, asserting (1) the district court erred by failing to include the good faith withdrawal exception in the jury instruction on the initial aggressor rule for self-defense

1

and by improperly instructing the jury on the State's burden of proof for self-defense; (2) the State committed prosecutorial error multiple times during closing arguments; and (3) the cumulative error doctrine requires the reversal of his convictions and sentences. After a thorough review of the record, we find no reversible error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On August 3, 2012, Langston and Tony Browning were driving side-by-side on 59th Street towards Leavenworth Road in Wyandotte County. Browning was driving his white SUV with his four-year-old son as a passenger; Langston was driving his blue pickup truck accompanied by his fiancée. Near the entrance to a high school, the left lane of 59th Street—Browning's lane—became a left-turn only lane. Browning accelerated his SUV to get in front Langston. In response, Langston quickly sped around Browning and hit his brakes. From here, Browning's and Langston's versions of events vary.

*Browning's Version of Events*

According to Browning, after Langston passed him and then slammed on his breaks, Browning had to drive his SUV onto the median to avoid hitting Langston's truck. Browning then drove off the median and pulled up next to Langston at the stoplight on 59th Street and Leavenworth Road. The two men exchanged words, with Langston telling Browning that he had a gun, that he would shoot Browning, and that he had kids. Browning replied to Langston that he also had a kid and that he also owned a gun. In reality, however, Browning did not have the gun with him that day. The two cars then turned left through the intersection and entered a shopping center parking lot with a Family Dollar on one end and a police station on the other. Langston waved at Browning to follow him towards the police station, but Browning turned around and drove towards the Family Dollar. Browning went into the Family Dollar; as Browning was getting back

2

into his car after leaving the store, he saw Langston drive out of the parking lot. Browning then drove to Dollar General.

At Dollar General, Browning looked into his rearview mirror and saw Langston standing in the middle of the street yelling and aiming a shotgun at him. Browning, who was too frightened to get out of his car because he thought Langston was going to shoot him, drove to his father's apartment complex located next to Dollar General. While in the apartment complex parking lot, Browning saw Langston run around the back of the building across from Dollar General. After Langston left, Browning saw a police officer enter Dollar General, so he went inside to get help. Browning estimated the entire incident lasted between three to five minutes.

*Langston's Version of Events*

According to Langston, when Browning cut in front of him on 59th Street, Browning's SUV almost hit the front of Langston's truck. Langston was annoyed that Browning had passed him, so he sped up and passed Browning to get back into the lead. Because Langston had to speed up to pass Browning, he then had to slow down to the 35 mph speed limit. Browning, however, refused to slow down and almost hit Langston's truck multiple times. Langston then accelerated and stopped in the middle of the road just before the 59th Street and Leavenworth Road intersection. Langston exited his car and, once Browning also stopped, walked to the driver's side of Browning's SUV. Langston claimed that as he approached Browning, he saw Browning reach toward what Langston thought was a gun. This concerned Langston, so he returned to his truck. Browning yelled threatening comments at Langston as he drove past him on 59th Street.

Langston also testified that as he drove his truck towards Leavenworth Road, he noticed that Browning's SUV had its right turn signal on, prompting Langston to pull into the left-turn only lane next to Browning. While waiting at the stoplight, Browning told

3

Langston and his fiancée that he had a gun and threatened to shoot them. To get away from Browning, Langston drove through the stoplight before it turned green. When he looked in his rearview mirror, he saw Browning following him through the intersection. Langston then pulled into the shopping center and waved at Browning to follow him towards the police station. Langston had a friend who worked as a security guard at a nearby bank, and Langston hoped he would be able to help them. Langston also hoped Browning was dumb enough to follow him to the police station. Browning turned away, but Langston went to the police station anyway and pressed the emergency button and knocked on the door.

With Browning gone, Langston decided it was safe to go home. As Langston pulled his truck out of the parking lot, Browning followed. Langston became scared that Browning was going to shoot them, so he accelerated his truck to 45-50 mph and quickly turned into his apartment complex's driveway located across the street from Dollar General. Langston parked his car and told his fiancée to go into the apartment. In less than a minute, Langston went to the back of the apartment building, grabbed his shotgun out of his RV, loaded four shotgun shells and chambered one, and walked to the front of the building. Langston saw Browning stopped in front of the property, and Langston walked towards him but never stepped into the street. He began to aim the shotgun at Browning but stopped when he saw Browning pull away and noticed Browning's young son in the car. Langston shouted at Browning to stay away from his family, and if Browning did not, he had a gun. After Browning pulled away, Langston went back into his apartment.

Later that day, Detective Anthony Sanchez of the Kansas City Police Department interviewed Langston about an alleged aggravated assault. Langston told him that the incident started on 59th Street and State Avenue when he was cut off by Browning. Langston said that at the intersection of 59th Street and Leavenworth Road he told Browning that he was going to beat him up, fuck him up, and that he had a gun. Langston

4

stated that during their verbal altercation, he saw Browning reach for something near the center console and told Sanchez he thought it was a gun.

Langston also told Sanchez that later in the conflict he waved at Browning to follow him towards the police station because he knew the security guard at a nearby bank. However, Langston stated that Browning did not follow him; but after Langston decided to head to his apartment, he saw Browning parked near Dollar General. Langston stated that he quickly drove his truck around to the back of the apartment, which was across the street from Dollar General, parked, grabbed his shotgun from his RV, and loaded it. Langston then went to the front of the apartment and saw Browning at the front of the property. Langston told Sanchez that he pointed the gun at Browning but did not shoot because he saw Browning had both hands on the wheel and that Browning's son was in the car. Shortly after, Browning pulled away and drove to another apartment complex across the street.

*Rivera's Version of Events*

A third party, William Rivera, who was not involved in the ongoing road rage between Langston and Browning, witnessed their final confrontation as he was working at Dollar General. Rivera testified that he was outside with an ice vendor when he saw a white SUV speeding after a blue pickup truck on Leavenworth Road. The two cars parted ways when the blue truck turned into a driveway across the street from Dollar General and the white SUV turned into the apartment complex next to the store. Rivera could not remember if the SUV slowed down in front of the building across the street but testified that he knew the SUV did not drive onto the property.

Rivera then saw Langston come from behind the building with a shotgun that looked shorter than normal. According to Rivera, Langston stood on the sidewalk near the corner, took one step into the street, and started to wave the shotgun in the air, yell,

5

and make obscene gestures at Browning, who remained in his SUV about 150 feet away. Rivera became scared and started to go inside Dollar General. Less than a minute later, Langston stopped and returned to the back of the building. Rivera then went inside the store; within minutes Browning came into Dollar General and told a police officer who was in the store what had happened.

*The Resulting Charges and Trial*

In August 2012, the State charged Langston with one count of aggravated assault under K.S.A. 2012 Supp. 21-5412(b)(1), a severity level 7 person felony, and one count of criminal carrying of a shotgun less than 18 inches in length under K.S.A. 2012 Supp. 21-6302(a)(5), a severity level 9 nonperson felony. After a trial, the jury found Langston guilty on both counts, and the district court sentenced Langston to 12 months' imprisonment for aggravated assault and a concurrent term of 6 months' imprisonment for criminal carrying of a weapon.

Langston timely appeals.

DID THE DISTRICT COURT ERR IN INSTRUCTING THE JURY?

Langston argues that the district court erred by denying his request to include in the jury instructions the good faith withdrawal exception to the initial aggressor rule of self-defense and by improperly instructing the jury on the State's burden of proof.

We apply a three-step analysis to jury instruction challenges by "'(1) [d]etermining whether [we] can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits to determine whether error occurred; and (3) assessing whether the error requires reversal. [Citation omitted.]'" *State v. McDaniel*, 306 Kan. 595, 614, 395 P.3d 429 (2017) (quoting

*State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 [2016]). As to the second step, when considering whether an instructional error occurred, we determine if the jury instruction was legally and factually appropriate under an unlimited standard of review of the entire record. See *McDaniel*, 306 Kan. at 614. To be legally appropriate, a jury instruction "'must always fairly and accurately state the applicable law.'" *State v. Kleypas*, 305 Kan. 224, 302, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017).

Langston preserved the issue for appeal by objecting to the jury instructions; therefore, if we find error on the second step, we then examine whether the error is harmless. See *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 (2015). When reviewing objections to jury instructions, we must examine the "'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.' [Citation omitted.]" *State v. Hilt*, 299 Kan. 176, 184-85, 322 P.3d 367 (2014).

A.      *Initial Aggressor Rule for Self-Defense*

Langston first argues that the district court erred by not instructing the jury on the good faith withdrawal exception to the initial aggressor rule of self-defense. Instruction No. 10 provided Langston's theory of self-defense:

> "Defendant claims his use of force was permitted as self-defense.
> "Defendant is permitted to threaten by words or actions to use physical force against another person including a threat to cause death or great bodily harm or display to another person a deadly weapon, to wit: a shotgun, when and to the extent that it appears to him and he reasonably believes such threat or display is necessary to defend himself or someone else against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.

7

"When use of force is permitted as self-defense or defense of someone else, there is no requirement to retreat."

As applied to a claim of self-defense, the initial aggressor rule states that the self-defense of the person justification under K.S.A. 2016 Supp. 21-5222 "is not available to a person who . . . otherwise initially provokes the use of any force against such person or another." K.S.A. 2016 Supp. 21-5226(c). However, an initial aggressor is permitted to reclaim the use of the self-defense justification if the initial aggressor meets one of two exceptions, known as the "retreat safe harbor exceptions." See *State v. Beltz*, 305 Kan. 773, 781-82, 388 P.3d 93 (2017). K.S.A. 2016 Supp. 21-5226(c) defines the retreat safe harbor exceptions as:

"(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or

(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force."

The jury was instructed on the first retreat safe harbor exception to the initial aggressor rule, but the district court denied Langston's request to include the second retreat safe harbor exception. Instruction No. 12 read:

"A person who initially provokes the use of force against himself or someone else is not permitted to use force to defend himself or someone else unless the person reasonably believes that he is in present danger of death or great bodily harm, and he has used every reasonable means to escape such danger other than the use of physical force which is likely to cause death or great bodily harm to the other person."

Langston claims he was entitled to an instruction which included the second exception. However, the PIK initial aggressor rule jury instruction, PIK Crim. 4th 52.250

8

(2016 Supp.), which largely follows the statutory language in K.S.A. 2016 Supp. 21-5226(c)(1) and (2), indicates that a district court may choose only one of the retreat safe harbor exceptions to instruct the jury: "A person who initially provokes the use of force against (himself) (herself) (someone else) is not permitted to use force to defend (himself) (herself) (someone else) unless *insert one of the following . . . .*" Because our Supreme Court "strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to [jury] instructions[,]" *Barber*, 302 Kan. at 377-78, it would appear that the district court's ruling is consistent with the PIK instructions on this point.

But even if Langston is correct that an instruction on the second exception was legally appropriate, such an exception would not have been factually appropriate. For an instruction to be factually appropriate, there must be sufficient evidence for a rational fact-finder to find for the defendant on that theory. See *McDaniel*, 306 Kan. at 614. Because Langston requested the second exception instruction at trial, we must view the evidence in the light most favorable to him. *State v. Dupree,* 304 Kan. 377, 397, 373 P.3d 811 (2016).

Langston argues on appeal that he in good faith clearly indicated his desire to withdraw from the use of force by fleeing from Browning on multiple occasions during the conflict. But the record shows that Langston testified he got out of his car and approached Browning's car. Langston did not in good faith withdraw by returning to his car because he then drove up next to Browning at the stoplight. The evidence does not support a finding that he in good faith clearly indicated a desire to withdraw from the conflict at the stoplight. Rather, Langston's own testimony establishes that he allowed the conflict to continue by engaging in a verbal exchange with Browning. Langston also argues that he in good faith withdrew by driving through the stoplight when it was still red. But when Langston saw Browning driving behind him, Langston admitted that he waved at Browning to follow him. Langston's waving at Browning to follow does not

9

clearly indicate a desire to withdraw; rather, Langston's desire is unclear because he also shows a desire to continue to interact with Browning. Significantly, at this point in the conflict, it was Browning who turned away from Langston—not the other way around.

Langston additionally asserts that he indicated in good faith a desire to withdraw and end the use of force by quickly speeding into his apartment complex after Browning followed him out of the shopping center parking lot. The evidence shows that Browning, arguably, continued the conflict by speeding after Langston's truck. But based on Langston's own testimony, Langston did not in good faith withdraw from the confrontation and clearly indicate his desire to end the use of force. Rather, the evidence shows that Langston continued the conflict because Langston himself testified that he parked his truck in the back of the apartment building, exited his car, retrieved the shotgun from the RV, loaded four shells into the shotgun, and chambered one. Langston then returned to the front of the apartment building and walked toward Browning; he began to aim the shotgun at Browning but stopped because Browning pulled away and Langston saw Browning's son.

When viewing the evidence in the light most favorable to Langston—and contrary to his position on appeal—sufficient evidence does not support a finding that Langston in good faith withdrew from the confrontation and indicated to Browning a desire to end the use of force. See K.S.A. 2016 Supp. 21-5226(c)(2). As a result, we find that the district court did not err in denying Langston's request for the second retreat safe harbor exception jury instruction because it was not factually appropriate.

Finally, even if we assume that Langston's request for the second exception instruction was both legally and factually appropriate, meaning the district court erred in refusing to give it, any error was harmless. An error is harmless if the State can demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no

10

reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012); *State v. Widmer*, No. 114,992, 2017 WL 1425945, at *5 (Kan. App. 2017) (unpublished opinion), *rev. denied* September 28, 2017.

On a number of occasions, under factually similar situations, our Supreme Court has upheld the denial of a self-defense jury instruction. See, e.g., *State v. Salary*, 301 Kan. 586, 595-97, 343 P.3d 1165 (2015) (person who leaves confrontation with individual and then returns and shoots that same person typically becomes ineligible for self-defense jury instruction absent proof that one retreat safe harbor exception applies); *State v. Harmon*, 254 Kan. 87, 91, 865 P.2d 1011 (1993) (defendant, as aggressor, "was not entitled to use deadly force in self-defense unless he had exhausted every other reasonable means to escape the danger he perceived"); *State v. Meyers*, 245 Kan. 471, 477, 781 P.2d 700 (1989) (exceptions of K.S.A. 21-3214, the precursor to K.S.A. 2016 Supp. 21-5226[c][1] and [2], not available because defendant left first confrontation and could have avoided fatal confrontation by staying home).

Here, the district court afforded Langston the opportunity to prove self-defense by providing a self-defense jury instruction. But when viewing the evidence in the light most favorable to Langston, the evidence overwhelmingly shows that Langston became the aggressor when he withdrew behind the apartment building then returned with the loaded shotgun, even though Browning may have threatened Langston verbally at the stoplight and through his subsequent actions. The evidence also shows that Langston did not exhaust every reasonable means to escape the conflict. At the very least, he could have stayed behind the apartment building. Because of the nature and weight of the evidence against Langston, we find there is no reasonable possibility that the district court's denial of an instruction on the second retreat safe harbor exception to the initial aggressor rule contributed to the verdict.

B.      *State's Burden of Proof for Self-Defense*

Langston next asserts the district court erred in instructing the jury on the State's burden of proof on his claim of self-defense. The State argues that Langston invited the error by requesting modifications to some of the proposed jury instructions and by failing to request the more specific instruction on the State's burden of proof for self-defense.

"Generally, a defendant cannot complain on appeal about a claimed error that was invited." *State v. Sasser*, 305 Kan. 1231, 1235, 391 P.3d 698 (2017). As applied to jury instructions, "[t]he invited error doctrine applies only when [a] party fails to object *and* invites the error." *State v. Logsdon*, 304 Kan. 3, 31, 371 P.3d 836 (2016). Our Supreme Court has stated that the doctrine almost certainly applies "when a defendant actively pursues what is later argued to be error," such as when the defendant submits a proposed jury instruction. *Sasser*, 305 Kan. at 1236. But see *State v. Clay*, 300 Kan. 401, 410, 329 P.3d 484, *cert. denied* 135 S. Ct. 728 (2014) (finding no invited error if unclear from record who proposed jury instruction).

Here, Langston's counsel submitted proposed jury instructions on aggravated assault, use of force in defense of a person, and use of force in defense of a dwelling. But based on the record on appeal, it does not appear that Langston offered any jury instructions on the State's burden of proof. Although Langston did not object to the instructions given, Langston also did not invite the alleged error. Without a definitive record that Langston took some action to propose or request the State's burden of proof jury instructions, we find the invited error doctrine inapplicable.

Langston concedes that he did not object to or request the jury instruction at issue. Therefore, our review is limited to a determination of whether the instruction was clearly erroneous under a two-step standard. Our first task is to determine whether the instruction as given was erroneous, i.e., legally and factually inappropriate, under an unlimited

12

review of the record. Then, if we find error, we will reverse only if we are firmly convinced that the jury would have reached a different verdict had the instructional error not occurred. The party asserting error bears the burden of establishing the prejudice necessary to require reversal. *State v. Staten*, 304 Kan. 957, 962-63, 377 P.3d 427 (2016).

Langston asserts that to provide a proper jury instruction on the State's burden of proof for self-defense, the district court had to expressly instruct the jury that the State had the burden to disprove the defendant's claim of self-defense beyond a reasonable doubt under K.S.A. 2016 Supp. 21-5108(c), which states:

> "A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies. Once the defendant satisfies the burden of producing such evidence, *the state has the burden of disproving the defense beyond a reasonable doubt*." (Emphasis added.)

In *Staten*, the district court instructed the jury on the crime charged, the theory of self-defense, and the State's general burden of proof in a criminal case. Staten asserted on appeal that the district court erred because it did not instruct the jury that the State must prove beyond a reasonable doubt that he did not act in self-defense. In assessing Staten's claim on appeal, our Supreme Court interpreted K.S.A. 2015 Supp. 21-5108(c) and found the defendant's assertion correct regarding the State's burden of proof for self-defense— the State must disprove self-defense beyond a reasonable doubt—but reasoned that the Legislature's enactment of K.S.A. 2015 Supp. 21-5108(c) did not alter Kansas law:

> "This amendment codified the caselaw requirement that, once a defendant properly asserts a self-defense affirmative defense, the State must disprove that defense beyond a reasonable doubt. . . . The amendment did not alter the law in Kansas concerning the State's burden of proof, and it did not create a new element that the State

13

must prove when charging a crime. Statutory self-defense is a rebuttable defense to certain crimes, as it was before the amendment. [Citations omitted.]" 304 Kan. at 965-66.

The *Staten* court ruled that appellate courts—even after the enactment of K.S.A. 2015 Supp. 21-5108(c)—must continue to review jury instructions as a whole to determine if "everything necessary for the jury to consider the burden of proof was contained within the instructions." 304 Kan. at 966. Notably, the *Staten* court did not find that the district court erred based on a failure to expressly instruct the jury using the statutory language in K.S.A. 2015 Supp. 21-5108(c); instead, the court found the jury instructions were not clearly erroneous. 304 Kan. at 967.

While Langston concedes on appeal that the *Staten* court found similar jury instructions to those provided at his trial proper under the clearly erroneous standard, he argues that we should reach the opposite conclusion found in *May v. Cline*, 304 Kan. 671, 372 P.3d 1242 (2016). We disagree.

First, our Supreme Court did not consider a jury instructional error in *May*; instead, the court reviewed an appeal from an inmate based on the Department of Correction's regulation on prison fighting. Specifically, the court interpreted K.A.R. 44-12-301, which defined prison fighting and the parties' burden of proof if an inmate claims self-defense. 304 Kan. at 671-76. In the *May* court's general review of the law on self-defense, it discussed the "burden-shifting" effect of K.S.A. 2015 Supp. 21-5108(c) but did not base its decision on the statute. Rather, it concluded: "K.A.R. 44-12-301 clearly and unambiguously makes the absence of self-defense an *element* of the offense itself." 304 Kan. at 676. As such, the decision in *May* does not control.

We now review the district court's jury instructions on the law of self-defense and the State's burden of proof as a whole to determine if the instructions fairly and

14

accurately stated the applicable law. See *Kleypas*, 305 Kan. at 302; *Staten*, 304 Kan. 962-63.

Instruction No. 5 provided the State's general burden of proof:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

Instruction No. 7 informed the jury what the State was required to prove for aggravated assault:

"The defendant is charged in Count I with Aggravated Assault. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant knowingly placed Tony Browning in reasonable apprehension of immediate bodily harm.

"2. The defendant used a deadly weapon, to wit: a shotgun.

"3. This act occurred on or about the 3rd day of August, 2012, in Wyandotte County, Kansas.

"No bodily contact is necessary."

Instruction No. 9 stated the burden of proof regarding self-defense:

"The defendant raises use of force in defense of a person or use of force in defense of a dwelling as a defense. Evidence in support of this defense should be

15

considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

Based on our review of the jury instructions as a whole, the district court provided legally appropriate instructions on the State's burden of proof, and the district court's jury instructions follow the current wording of the PIK instruction on each issue. See PIK Crim. 4th 51.010 (State's burden of proof); PIK Crim. 4th 54.280 (2016 Supp.) (aggravated assault); PIK Crim. 4th 51.050 (2013 Supp.) (burden of proof defenses). Moreover, unlike in *Staten*, where the court found the district court committed instructional error (but not clear error) by failing to give the affirmative defense burden of proof instruction contained in PIK Crim. 4th 51.050, the district court here did include such an instruction.

Because the jury instructions provide an accurate statement of the law on the theory of self-defense and the State's burden of proof when viewed as a whole, we find the jury instructions legally appropriate. Given that Langston does not argue the instructions were not factually appropriate, we conclude the district court provided the jury with legally and factually appropriate instructions.

DID THE STATE COMMIT PROSECUTORIAL ERROR DURING CLOSING ARGUMENTS?

Langston also argues that the State committed prosecutorial error during closing arguments by (1) bolstering its own witnesses' credibility and injecting personal opinions on Langston's credibility, (2) accusing Langston of lying, and (3) misstating the evidence.

Langston made no objection to the State's alleged errors during closing arguments. However, we review claims "of prosecutorial error during closing argument regardless of whether the defendant raised a contemporaneous objection." *State v. Pribble*, 304 Kan.

16

824, 831, 375 P.3d 966 (2016). In reviewing claims of prosecutorial error, we employ a two-step process

> "simply described as error and prejudice. [First, we] must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, [we] must next determine whether the error prejudiced the defendant's due process rights to a fair trial. . . . [P]rosecutorial error is harmless if the State can demonstrate . . . 'there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

"Every instance of prosecutorial error will be fact specific, and any appellate test for prejudice must likewise allow the parties the greatest possible leeway to argue the particulars of each individual case." 305 Kan. at 110.

Langston first asserts that the State committed prosecutorial error during closing arguments by improperly bolstering its own witnesses' credibility. "We have consistently held that it is 'improper for a prosecutor to attempt to bolster the credibility of the State's witnesses.'" *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015) (quoting *State v. Donaldson*, 279 Kan. 694, 708, 112 P.3d 99 [2005]). Moreover, a prosecutor is forbidden from offering a personal opinion that the defendant's testimony is untruthful because "'expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony, not commentary on the evidence of the case.' [Citations omitted.]" *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014). This notwithstanding, we afford prosecutors wide latitude to explain "'to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses.'" *Sprague*, 303 Kan. at 428-29 (quoting *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 [2009]). A prosecutor may even comment "'during closing arguments regarding the witness' motivations to be untruthful.' . . . But a prosecutor must do so by

basing the comment on evidence and reasonable inferences drawn from that evidence and without stating his or her own personal opinion concerning a witness' credibility or accusing a witness or defendant of lying. [Citations omitted.]" *State v. Armstrong*, 299 Kan. 405, 427, 324 P.3d 1052 (2014).

The alleged error occurred when the prosecutor commented on the evidence concerning whether Browning stopped and drove his SUV into Langston's apartment complex:

> "Another important thing to consider when judging someone's testimony is their motive. Now, the witness in this case, William Rivera, he's a third party person who has no prior knowledge of either the victim or the defendant, he didn't know either of them. And he sat up there and told you several things. He told you that he saw the victim go past the defendant's residence and pull into the parking lot near the apartment complex.
>
> . . . .
>
> ". . . He told you that [the victim] didn't stop and did not pull up onto the defendant's property. The victim told you the same thing. And neither one of them have any incentive to fabricate a story, especially William Rivera. He didn't know either one of these people, he had no reason to side with either of these people. He's just telling you what he saw.
>
> "And the defendant, consider his motive as well. Consider his motive in testifying, consider his motive in—and what he told you now. He's the one charged with the offense. He's the one who has motive to fabricate and change details to be in his favor."

We see no error in the prosecutor's comments here. In context, the prosecutor was explaining to the jury how to judge witness credibility. Before the prosecutor made the comments regarding Rivera's, Browning's, and Langston's testimony, she told the jury, "[I]t's up to you to determine the weight and credit to be given to the testimony of each witness." The prosecutor directed the jury to items that it should consider in determining witness credibility, such as the consistencies or inconsistencies between the witnesses'

testimony. Additionally, the prosecutor's comments on Langston's motives were reasonably inferred from the witnesses' testimony. Here, Rivera's testimony corroborated Browning's version of events—that Browning did not stop and drive his SUV into Langston's apartment complex. As a result, Rivera's testimony is inconsistent with Langston's testimony—that Browning did stop his SUV in front of Langston's apartment complex. Because the prosecutor based her comment on evidence or reasonable inferences drawn from the evidence, we find no prosecutorial error.

Next, Langston asserts that the State committed prosecutorial error by accusing Langston of fabricating his belief that Browning had a gun.

"'When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable. However, the ultimate conclusion as to any witness' veracity rests solely with the jury.'" *State v. King*, 288 Kan. 333, 352, 204 P.3d 585 (2009) (quoting *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 [2000]). A prosecutor is forbidden from offering a personal opinion that the defendant's testimony is untruthful. Likewise, a prosecutor is forbidden from accusing a defendant of lying, and this prohibition extends to any derivative of "lie" such as "'yarn'" and "'fabrication.'" *Brown*, 300 Kan. at 560 (citing *State v. Elnicki*, 279 Kan. 47, 62, 105 P.3d 1222 [2005]).

Here, the prosecutor used a form of the word "fabrication" three times during closing arguments in reference to Langston's testimony. The first two times occurred when the prosecutor was describing the inconsistencies and consistencies of the witnesses' testimony concerning whether Browning stopped in front of Langston's apartment complex. The third use of fabrication occurred when the prosecutor described the evidence showing whether Browning had a gun during closing rebuttal:

"The defendant said the victim had a gun, yet we know he didn't have a gun. Tony Browning told you he didn't have a gun, the witness William Rivera said he never saw Mr. Browning with a gun. Detective Littlefield searched his car and didn't find a gun. There was no gun. *That's just a fabrication of the defendant*. There was no gun in this case." (Emphasis added.)

In light of the fact that there was no evidence—apart from Langston's unsupported claim—that Browning had a gun on him, and despite our Supreme Court's directives concerning prosecutorial error, we are reluctant to label as error the prosecutor's branding of Langston's claim that Browning had a gun as a fabrication. But even if we accept Langston's argument that there was prosecutorial error here, any such error was harmless.

To demonstrate harmlessness, the State must show there is no reasonable possibility that the State's error contributed to the verdict. See *Sherman*, 305 Kan. at 109. The State argues that the weight of the evidence against Browning means any such prosecutorial error was harmless. Langston counters that because this case consisted of witness credibility determinations, the prosecutor's comments prejudiced his right to a fair trial.

The Kansas Supreme Court found a prosecutor's accusation that the defendant was a liar during closing arguments to be prejudicial in *State v. Pabst*, 268 Kan. 501, 996 P.2d 321 (2000). In *Pabst*, the defendant was on trial for first-degree murder for the shooting death of his fiancée. The defendant maintained that the shooting was accidental and testified in his own defense. During closing arguments, the prosecutor accused the defendant of lying 11 times. The *Pabst* court held that the defendant's credibility was "crucial" to the case and found that the prosecutor erred by repeatedly accusing the defendant of lying during closing arguments. 268 Kan. at 507. In assessing the prejudicial effect of the prosecutor's error, the *Pabst* court reasoned:

"[I]t is important to first recognize that the jury here had to decide whether the shooting was accidental or planned. The prosecutor should have confined his arguments to what the evidence showed. Instead, the prosecutor's improper argument commented on what the jury inevitably had to decide: whether Pabst's assertion of an accidental shooting was a fabrication. The prosecutor's statements are problematic because he improperly and prejudicially attempted to introduce evidence on the ultimate issue." 268 Kan. at 509.

Like *Pabst*, Langston's credibility as the defendant is at issue. But in contrast to *Pabst*, Langston's credibility was not an essential element of the case. In *Pabst*, only the defendant could claim the shooting was accidental. Here, Langston had a plausible claim of self-defense, and the jury could consider other evidence such as what Browning and Rivera experienced and how Sanchez recorded Langston's version of events shortly after the incident. Thus, while Langston's credibility as a witness was important to his claim, his defense did not rest upon it.

Moreover, the evidence against Langston was overwhelming. Aggravated assault requires proof that the defendant used a deadly weapon and knowingly placed another person in reasonable apprehension of immediate bodily harm. K.S.A. 2016 Supp. 21-5412(a) and (b)(1). Langston testified that he approached the front of his apartment complex carrying a shotgun and that he almost pointed the gun at Browning. Langston also testified that he yelled at Browning that he should stay away from his family because he had a gun. Sanchez testified that Langston stated during his interview after the incident that he pointed the shotgun at Browning. Moreover, the jury considered Browning's testimony that he saw Langston aim the shotgun at him and that Browning remained in his car during the incident. Based on the above testimony, we find the evidence against Langston overwhelming and conclude that any prosecutorial error was harmless because there is no reasonable possibility the error contributed to the verdict.

Langston next argues that the State committed prosecutorial error in misstating the evidence during closing arguments. "'[A] prosecutor's arguments must remain consistent

21

with the evidence.'" *Davis*, 306 Kan. 400, 414, 394 P.3d 817 (2017) (quoting *Pribble*, 304 Kan. at 832).

Specifically, Langston argues the prosecutor erred in repeatedly stating Rivera's testimony corroborated Browning's version of events that Langston went into the middle of the street with the shotgun. During closing, the prosecutor argued:

> "Now, we do know a few things. You can be certain of a few things. We know that the defendant was in the middle of Leavenworth Road waving a shotgun around at the victim and we know that again because the victim testified to that and the witness testified to that, that the defendant was in the middle of the road waving a shotgun while the victim was across the street of the Dollar General at the apartment complex."

We must conclude that the prosecutor misstated Rivera's testimony because Rivera testified that he saw Langston approach Leavenworth Road and take a step into the street. The record also provides Sanchez' testimony that, according to his interview with Rivera, Rivera did not see Langston go into the middle of the street but saw Langston go to the corner of the street.

Again, however, the prosecutor's error on this point is harmless. The district court provided an instruction to the jury that it should disregard any statements made by counsel that were not supported by evidence. Additionally, the evidence overwhelmingly supports a finding that Langston committed aggravated assault whether or not he went into the middle of Leavenworth Road with the shotgun. According to Langston, he approached Browning with the shotgun when Browning was in the front of his apartment complex. Langston's own testimony supports the finding that he committed aggravated assault on Browning in that instance. Therefore, any error by the prosecutor was harmless because there is no reasonable possibility that the error contributed to the verdict.

DOES CUMULATIVE ERROR REQUIRE REVERSAL OF LANGSTON'S CONVICTIONS?

Finally, Langston argues that his convictions should be reversed based on the cumulative effect of the individual trial errors.

> "When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all the errors and, even if those errors individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. In undertaking such an analysis, this court reviews the entire record and exercises unlimited review. [Citations omitted.]" *State v. Sean*, 306 Kan. 963, 993, 399 P.3d 168 (2017).

"'[I]f any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.'" *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194 (2017) (quoting *State v. Tully*, 293 Kan. 176, Syl. ¶ 1, 262 P.3d 314 [2011]).

Here, there is no cumulative error. While the prosecutor erred by misstating a witness' testimony during closing arguments, such error was harmless and there was no other error. A single error cannot constitute cumulative error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014). Langston was given a fair trial, and his convictions should not be reversed.

Affirmed.