IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,305

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL STATEN,
*Appellant.*

SYLLABUS BY THE COURT

1.

Once a defendant properly asserts a self-defense affirmative defense, the State must disprove that defense beyond a reasonable doubt.

2.

K.S.A. 2015 Supp. 21-5108(c) codifies the caselaw requirements of the State's burden of proof in disproving self-defense.

3.

The adoption of K.S.A. 2015 Supp. 21-5108(c) did not alter the law in Kansas concerning the State's burden of proof, and it did not create a new element that the State must prove when charging a crime. Self-defense remains a rebuttable defense to certain crimes.

4.

When a defendant articulates a defense of self-defense, it is error not to instruct the jury that the State's burden of proof does not shift to the defendant.

1

5.

When a party fails to object to or request a jury instruction, appellate review is limited to a determination of whether the instruction was clearly erroneous.

6.

A defendant seeking substitute counsel must show "justifiable dissatisfaction" with current counsel, which may be demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant.

7.

A defendant's articulated statement of attorney dissatisfaction triggers a duty on the part of the court to inquire into potential conflicts of interest.

8.

A trial court's duty of inquiry into a potential conflict of interest between an attorney and the attorney's client may result in three types of errors, each of which is reviewed for an abuse of discretion. The first type of error occurs when a district court becomes aware of a potential conflict of interest but fails to conduct an inquiry. Such a failure constitutes an error of law, that is, a failure to follow the law and fulfill a legal duty. The second type of error occurs when a district court conducts an inquiry but fails to do so in an appropriate manner. An appropriate inquiry requires fully investigating both the basis for the defendant's dissatisfaction with counsel and the facts necessary for determining whether the dissatisfaction justifies appointing new counsel. The third type of error may occur when a district court conducts an appropriate inquiry but fails to make a decision that is reasonable in light of the facts that come to the fore.

Review of the judgment of the Court of Appeals in an unpublished opinion filed January 23, 2015. Appeal from Wyandotte District Court; ROBERT P. BURNS, judge. Opinion filed August 12, 2016. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, argued the cause, and *Rebecca L. Kurz*, of The Kurz Law Office, LLC, of Mission, was on the brief for appellant.

*Jennifer S. Tatum*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Michael Staten was convicted by a jury of one count of aggravated battery. The Court of Appeals affirmed his conviction, and we granted review.

FACTS

Staten and Yvonne Williamson shared an apartment in Wyandotte County. In the early morning of July 22, 2011, the two engaged in an altercation that left Williamson severely injured. Witnesses disagreed on the circumstances leading up to the altercation, resulting in two distinct narratives, which we set out below.

*Williamson and other witnesses recalled the following sequence of the events.*

Williamson testified that on July 21, she got off work around 9 p.m. and went home to cook dinner. Staten was already home, and they got into an argument. Williamson decided to leave and walk to a nearby liquor store in order to keep the argument from escalating. Upon returning home with her purchase, the argument became

more heated, and she again left, this time to visit a friend, where she talked, watched television, drank some brandy, smoked some marijuana, and consumed some cocaine.

Early the next morning, around 1:30 a.m., she returned to her apartment, feeling anxious and anticipating a continued argument with Staten. When she arrived, Staten was angry and had been drinking. He told her to get her belongings and leave. She packed her clothes, and he threw them out onto the back porch. While she was putting her clothes in her car, he attempted to lock her out of the house. He came outside about 20 minutes later and persuaded her to return to the apartment.

Once inside, they began to argue again. Staten grabbed her keys, and she called him a "bitch." He hit her in the face with the keys, and then he pulled her into the bathroom, where he began beating her so hard that she started to bleed profusely. When he grabbed her by the hair, she bit him in an attempt to make him release her, and he put his arm around her neck in a chokehold. He informed her that he was going to kill her and then turn himself in to authorities in the morning. He finally released her when he got up to get something, and she ran outside and shouted for help.

Staten followed her outside and started swinging a stick at her. The stick had a nail protruding from one end. As she was trying to protect herself from the blows, one of her knuckles was broken. After he had hit her several times with the stick and his fist, she fell to the ground. He continued to hit her and kick her and told her that he would kill her, that she did not deserve to live, and that nobody would want her when he was through with her. She lay still until an ambulance arrived.

She was hospitalized for 4 days. In addition to receiving scars and bruises, she suffered a puncture wound near her lung, and she eventually received surgery for an

4

injury to one eye. She denied having threatened or attacked Staten and testified that she bit him only after he grabbed her hair.

A neighbor, Emmanuel Rivera, testified that he was awakened by his dog barking and looked out his apartment window to see Staten "beating the crap out of a woman." He reported that Staten was hitting the woman so hard with a stick that the stick broke and part of it flew away some distance. He saw Staten continue to hit her with the broken stick, then kick her, and then drag her around on the ground. In Rivera's opinion, it appeared that Staten was hitting and kicking the woman so hard that he was trying to kill her. Rivera shouted to him that he should stop or Rivera would call the police. Staten hit the woman a few more times and then threw the stick into a neighbor's yard. Rivera never saw the woman attack or attempt to hit Staten; she lacked the strength to do that, and she was unable to defend herself. While the woman screamed for help, Staten called her a "whore" and told her he was going to kill her. When emergency vehicles approached, Rivera saw Staten go back inside.

Edward Miller, a neighbor and acquaintance of Staten and Williamson, spent the evening of July 22 hanging out with Staten and a third man outside the apartment. They listened to music and waited for Williamson to return home. Around midnight, the three parted company and went into their respective apartments. Later, Miller's fiancé woke him and told him he needed to go get Staten. Going outside, Miller heard a lot of yelling and saw Williamson lying in the middle of the parking lot. She was bloody but speaking in a normal voice. Staten was shouting that "she deserved it." Miller pulled Staten away from Williamson and tried to stay between them. Staten went back inside his apartment, and Miller stayed outside until the police and ambulance arrived.

Miller's fiancé, Nicole Vaughn, also witnessed some of the events. After hearing some noise in the parking lot, she looked out her apartment window and saw Staten with

5

his hand raised as if he was preparing to strike Williamson. She woke Miller up, ran downstairs, and called the police. Williamson was seated or lying "helpless" on the ground, and Staten was standing over her. Vaughn saw no aggressive behavior on Williamson's part. Instead, she watched Staten kick Williamson and hit her several times, either with his fist or with a stick with a sharp object on the end. She also heard Staten say, "[T]his bitch deserves to die." After Staten returned to his apartment, Vaughn walked over to Williamson, who was unrecognizable because there was so much blood and because her hair was matted to her head and her face was so swollen.

*Staten testified to a different version of the events and subsequent altercation.*

On the evening of July 21, Staten saw another man escorting Williamson home across the parking lot. When she arrived back in the apartment, Staten and Williamson had a tense encounter, and Williamson then left for several hours.

She returned to the apartment around 1:15 in the morning. When she arrived, Staten was in the living room. She grabbed a beer out of the refrigerator and walked into the bedroom. Staten followed her, intending to ask about the earlier situation, but she was on the telephone and he decided to wait. He told her they could discuss the matter later in the morning, and she agreed, so he returned to the front room to get ready for bed. He got in bed around 1:25, while Williamson stayed up and played a computer game.

Around 3 a.m., Williamson walked toward the kitchen and kicked the futon mattress on which Staten was sleeping. Returning from the kitchen, she told him that he did not have to worry about her staying because she was leaving. He went into the bedroom and saw that she had packed her clothes. He told her that packing her clothes meant she was ready to leave, so he took two bags of clothing and set them on the back porch, along with some of her other belongings. When she went to see where he had put

6

her belongings, he locked her out of the bedroom, hoping that some time alone would defuse her antagonism.

When Staten heard Williamson putting things in her car, he locked her out of the apartment because he was concerned that she was agitated and confrontational. Then he went outside to talk with her after she had calmed down. After they talked for about 20 minutes, he went around to the front to smoke a cigar while she went back inside. He saw her take his keys and start to drop them in her purse, at which time he grabbed the key chain and snatched the keys out of her purse.

Williamson ran toward him, called him a "bitch," and grabbed his keys. Staten warned her that he would call the police, whereupon Williamson grabbed his right hand and bit him on the right ring finger. As she bit down, he grabbed her in a headlock in an attempt to make her release his finger. After she finally let go, he got up and went into the living room to get his cell phone to call the police. While he was trying to unplug his phone from its charger, Williamson ran up and hit him with a stick that they had been using to hang laundry. She hit him on the head and in the face and chased him out of the apartment.

They both tripped over a bicycle railing, and he wrestled the stick away from her and hit her. She ran back toward him, so he hit her again in order to protect himself. Williamson said she was going to kill him, and he thought he was going to die. It was only after he had struck her several times that she became subdued enough to cease her attack, and he returned to the apartment.

*The verdict and sentence*

A jury found Staten guilty of one count of aggravated battery, and he was sentenced to a standard term of 154 months and ordered to pay $27,000 in restitution. He took a timely appeal to the Court of Appeals, which affirmed the conviction. *State v. Staten*, No. 108,305, 2015 WL 423644 (Kan. App. 2015) (unpublished opinion). This court granted review with respect to all issues.

ANALYSIS

*Jury instruction on burden of proof for self-defense*

Staten first complains that the jury instructions failed to inform the jury properly what the burden of proof was and who bore it. He asserted a self-defense theory at trial. He contends that the district court committed reversible error by failing to instruct the jury that the State was required to prove beyond a reasonable doubt that he did not act in self-defense. While the district court gave a general burden of proof instruction, it did not instruct specifically how the reasonable-doubt standard should apply to the self-defense instruction. Staten maintains that, despite his failure to object, this omission constituted reversible error.

When a party fails to object to or request a jury instruction, appellate review is limited to a determination of whether the instruction was clearly erroneous. Review under this standard consists of two steps:  first the appellate court determines whether the instruction as given was erroneous, that is to say, not legally and factually appropriate, after an unlimited review of the record; and second, if there was error, the appellate court will reverse only if it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party asserting a clearly erroneous

8

instruction maintains the burden of establishing the degree of prejudice necessary to require reversal. *State v. Knox*, 301 Kan. 671, 680, 347 P.3d 656 (2015).

Staten argues that, in order to find him guilty, the jury had to be instructed that the State bore the duty of proving beyond a reasonable doubt that he did not act in self-defense.

Instruction No. 5 informed the jury of what the State was required to prove:

"The defendant is charged with the crime of aggravated battery. The defendant pleads not guilty.
"To establish this charge, each of the following claims must be proved:
"1. That the defendant intentionally caused great bodily harm to another person; to wit: Yvonne Williamson; and
"2. That this act occurred on or about the 22nd day of July, 2011, in Wyandotte County, Kansas."

Instruction No. 7, explaining the theory of self-defense, read:

"Defendant claims his use of force was permitted as self-defense.
"Defendant is permitted to use force against another person when and to the extent that it appears to him and he reasonably believes such physical force is necessary to defend himself against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief."

Instruction No. 9, relating to the State's burden of proof, read:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of any of the claims required to be proved by the State, you should find the defendant guilty."

Neither PIK Crim. 4th 51.050 (2013 Supp.) nor its substantially similar predecessor, PIK Crim. 3d 52.08 (2008 Supp.), was given. PIK Crim. 4th 51.050 (2013 Supp.) would have informed the jury:

"The defendant raises *describe the defense claimed* as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

Staten did not propose this instruction to the court and did not object to its omission.

Self-defense has been recognized in Kansas as a defense against charges of battery for well over a century. In *The State v. Newland*, 27 Kan. 764 (1882), the court upheld the propriety of a jury instruction directing the jury that if the defendant "'acted throughout only in a self-defense which was necessary, or apparently necessary, to avoid personal injury, then he should be acquitted.'" 27 Kan. at 768-69. The court determined that the remaining instructions adequately informed the jury of matters such as the presumption of innocence and questions of reasonable doubt. 27 Kan. at 767.

This court first considered the failure to instruct the jury under PIK Crim. 2d 52.08 in the absence of an objection in *State v. Osbey*, 238 Kan. 280, 285-86, 710 P.2d 676 (1985). There, the court held there was no error because the jury was instructed on defense of a person, reasonable doubt, the burden of proof, the definitions of the various legal terms relating to criminal intent, and the fact that the State's burden to prove such intent never shifts to the defendant. "Error cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused." 238 Kan. at 286.

Next, in *State v. Crabtree*, 248 Kan. 33, 805 P.2d 1 (1991), the court applied a clear-error standard in analyzing whether the omission constituted reversible error. 248 Kan. at 39-40. The court considered the instructions given as a whole, concluding that the general burden of proof instruction sufficed to make it clear to the jury that the defense relates to the State's burden of proof beyond a reasonable doubt. 248 Kan. at 39-40. The court then added that the evidence supporting the defense was vanishingly weak and that consideration of the evidence, combined with the accuracy of the instructions as a whole, did not lead to reversible error. 248 Kan. at 40-41.

Then, in *State v. Sperry*, 267 Kan. 287, 978 P.2d 933 (1999), this court was again confronted with a self-defense instruction given without the clarifying 52.08 PIK instruction. The court applied a standard of clear error because the defendant failed to object to the omission of the 52.08 instruction on burden of proof. 267 Kan. at 294. The court deemed the *Crabtree* language relating to the weakness of the defendant's evidence to be dicta and not essential to determining reversibility. Relying on *Crabtree*, the court concluded that the instructions as a whole sufficed to cover the subject of the burden of proof when a self-defense instruction is given. 267 Kan. at 294-95.

11

In *State v. Cooperwood*, 282 Kan. 572, 581-82, 147 P.3d 125 (2006), this court subsequently reaffirmed *Crabtree*, holding that the trial court's failure to instruct the jury with PIK Crim. 3d 52.08 was not clearly erroneous.

These cases were all decided under a statutory scheme that did not explicitly refer to the burden of proof when the defendant asserts an affirmative defense. K.S.A. 21-3109 simply explained the presumption of innocence and the requirement of proof beyond a reasonable doubt, as well as setting out rules for lesser included offenses.

In 2010, the Kansas Legislature repealed 21-3109 and created K.S.A. 2011 Supp. 21-5108(c), which read, in relevant part:

> "(c) A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies. Once the defendant satisfies the burden of producing such evidence, the state has the burden of disproving the defense beyond a reasonable doubt." L. 2010, ch. 136, § 8.

This amendment codified the caselaw requirement that, once a defendant properly asserts a self-defense affirmative defense, the State must disprove that defense beyond a reasonable doubt. See Kansas Criminal Code Recodification Commission's Final Report, Appendix A, Section 21-31-301, Comment (2010). The amendment did not alter the law in Kansas concerning the State's burden of proof, and it did not create a new element that the State must prove when charging a crime. Statutory self-defense is a rebuttable defense to certain crimes, as it was before the amendment. See, *e.g.*, *State v. Henderson*, 284 Kan. 267, 276, 160 P.3d 776 (2007) (discussing *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 [2004]); *State v. Shore*, No. 97,833, 2007 WL 4578005, at *1-4 (Kan. App. 2007) (unpublished opinion), *rev. denied* 286 Kan. 1185 (2008).

12

The cases prior to the statutory amendment read the instructions as a whole and concluded that everything necessary for the jury to consider the burden of proof was contained within the instructions. We see no reason to change course from that line of cases.

Other jurisdictions have applied reasoning similar to our case analysis. *Paprocki v. Foltz*, 869 F.2d 281, 285-86 (6th Cir. 1989) (instruction stating that burden of proving guilt is upon prosecution throughout entire trial and that burden at no time shifts to defendant sufficed to inform jury that State bore burden of establishing guilt beyond reasonable doubt in light of defendant's self-defense theory); *United States v. Jackson*, 569 F.2d 1003, 1010-11 (7th Cir. 1978) (instructions informed jury of prosecution's burden of proof and evidence against self-defense claim so overwhelming that it was "very unlikely that the burden of proof omission had any effect on the jury's determination of this case"; therefore, no plain error). See, *e.g.*, *Moore v. State*, 275 Ind. 39, 42-43, 414 N.E.2d 558 (1981) (jury correctly instructed on State's burden to prove all elements of crime beyond reasonable doubt; additional instruction dealing only with the burden of proof as to self-defense was unnecessary); *Woods v. State*, 162 Ind. App. 316, 326, 319 N.E.2d 688 (1974) (instructions, taken as whole, sufficiently informed jury of State's burden of proof, even though instruction on self-defense did not explicitly address State's burden of proof beyond reasonable doubt); *Tichnell v. State*, 287 Md. 695, 714, 415 A.2d 830 (1980) (in death-penalty appeal, court rejected claim that trial court's failure to instruct the jury clearly that burden was on State to prove he did not act in self-defense constituted plain error, but separate instruction informed jury that burden of proof remained "with the State throughout the trial"; this instruction sufficed to ensure jury would assign proper burden of proof to self-defense claim); *State v. Cooksey*, 499 S.W.2d 485, 490 (Mo. 1973) (when instructions as whole covered presumption of innocence, reasonable doubt of guilt, and State's burden to prove guilty beyond reasonable doubt, court not required to give combined self-defense and burden-of-proof

13

instruction); *State v. Syed Tagi Shah*, 134 Wis. 2d 246, 256-58, 397 N.W.2d 492 (1986) (reasonable jurors would interpret instructions as whole and would apply to self-defense instruction other instructions governing presumption of innocence and State's burden of proof).

The failure to give the PIK instruction was error, but it was not clear error. Instructions are clearly erroneous only when the reviewing court is firmly convinced that there is a real possibility that the jury would have reached a different verdict in the absence of the error. *State v. Richardson*, 290 Kan. 176, 178, 224 P.3d 553 (2010). In light of the generally correct nature of the instructions as a whole as well as the nature of the evidence supporting Staten's claim of self-defense, we find no basis in the instructions to reverse Staten's conviction.

*Prosecutorial misconduct*

Staten next argues that, during closing argument, the prosecutor engaged in misconduct that was of such a magnitude that it requires reversal.

The prosecution opened its cross-examination of Staten with the following exchange:

"Q:    Would you agree with me that what she suffered was great bodily harm as a
        result of this incident?
"A:    And me defending myself, yes, ma'am.
"Q:    So you acknowledge that she suffered great bodily harm?
"A:    In defense of myself, yes."

During closing argument, the prosecutor told the jury:

"All of these elements that I have to prove to you beyond a reasonable doubt are true. He said yes, it happened in Wyandotte County, and yes, I caused great bodily harm to her. He gives you that, so he is guilty of aggravated battery as we stand here."

Staten did not object to the prosecutor's questions during cross-examination. He is therefore precluded from arguing on appeal that there was error in introducing that evidence to the jury. See K.S.A. 60-404; *State v. Sprague*, 303 Kan. 418, 432-33, 362 P.3d 828 (2015).

He contends, however, that the prosecutor engaged in misconduct during the closing argument by referring to the testimony obtained by the cross-examination questions. He directs the court's attention to *State v. Crum*, 286 Kan. 145, 184 P.3d 222 (2008).

In *Crum*, the prosecution on cross-examination elicited testimony from the defendant suggesting that the defendant agreed that the murder in question was intentional and had been premeditated, although the defendant denied being the perpetrator. Then, during closing argument, the prosecution argued to the jury that it did not have to prove premeditation because the defendant had conceded that the murder method "'sounds like a plan.'" 286 Kan. at 154.

We noted that the issue of premeditation was not undisputed and the prosecutor's statement that he did not have to argue why the facts established the element of premeditation exceeded the wide latitude afforded to prosecutors in discussing the evidence. The court then perceived the argument as "so fundamentally erroneous as to be gross and flagrant." 286 Kan. at 154. Furthermore, the combination of eliciting improper

lay opinion testimony and then characterizing the equivocal responses as a stipulation to an element of the crime connoted ill will or "such misunderstanding of basic legal principles as to be tantamount to ill will." 286 Kan. at 154-55.

The court nevertheless determined the evidence of guilt in the case to be "overwhelming." In addition, the prosecutor included proper argument on how other facts supported premeditation, and the question of premeditation was not a close call for the jury. The critical issue for the jury was the identity of the perpetrator. The court concluded the error was harmless. 286 Kan. at 155.

The testimony in the present case differed from that in *Crum* in two important respects. First, the relevant facts before us now were undisputed. It was not contested that Staten struck Williamson and that she experienced great bodily injury as a result. These facts were not the fulcrum on which the success of Staten's defense rested. Staten's own testimony on direct examination conceded that narrative. Staten argued instead that his actions and Williamson's injuries were provoked by her attack on him, and he did not waiver from that theory on cross-examination. The prosecutor focused her closing argument on Staten's theory of self-defense. She acknowledged the presumption of innocence that attaches to a defendant, while also referring to evidence casting doubt on the elements of self-defense. Furthermore, in *Crum*, the elicited testimony went to the defendant's opinion regarding the perpetrator's thoughts and intent. Here, the elicited testimony was not speculative but was explicit—the defendant struck the victim, causing her serious injuries, but the actions were motivated by a legally justifiable intent.

The prosecutor nevertheless erroneously stated that "he's acknowledged he's guilty of this crime . . . ." The prosecutor thus mischaracterized Staten's testimony and referred to facts not in evidence. Staten did not acknowledge that he was guilty; instead, he testified that he was not guilty because he acted in self-defense. The comments were

16

therefore outside the wide latitude allowed a prosecutor in discussing evidence. See *Sprague*, 303 Kan. at 427.

We nevertheless do not find the comments to rise to the level of reversible misconduct. The prosecution maintained a focus on the pivotal question of self-defense and did not show evidence of ill will or flagrant disregard for the rules governing arguments. Moreover, the evidence was of such a direct and overwhelming nature that the error carried little weight. See *Sprague*, 303 Kan. at 427. In light of the entire record, there is no reasonable possibility that the error affected the verdict, and reversal is not appropriate. See *State v. Rosa*, 304 Kan. 429, 439, 371 P.3d 915 (2016).

*Request for new counsel*

Staten next argues that the trial court abused its discretion both in the manner in which it inquired about an alleged conflict of interest as well as in denying his request for new counsel. Before the trial commenced, Staten asked the court to provide him with new counsel, alleging a conflict with his appointed counsel and a breakdown of communication. On appeal, he contends that the district court abused its discretion when it denied the motion.

A district court's refusal to appoint new counsel is reviewed under an abuse of discretion standard. *State v. Sappington*, 285 Kan. 176, 196, 169 P.3d 1107 (2007). A court abuses judicial discretion if its action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Wells*, 297 Kan. 741, 753-54, 305 P.3d 568 (2013). If the district court has a reasonable basis to conclude that counsel could provide "'effective aid in the fair presentation of a defense,'" then it cannot be found to be an abuse of discretion. *Sappington*, 285 Kan. at 196. The defendant bears

the burden of proving the district court abused its discretion in denying the motion for new counsel. 285 Kan. at 196.

We recently provided an extensive framework for analyzing the denials of requests for new counsel in *State v. Pfannenstiel*, 302 Kan. 747, 758-60, 357 P.3d 877 (2015).

The right to counsel under the Sixth Amendment to the United States Constitution contains a correlative right to representation that is unimpaired by conflicts of interest or divided loyalties. Conflicts of interest and divided loyalties can take many forms, and whether an actual conflict exists is evaluated on the specific facts of each case. In general, a conflict exists when an attorney is placed in a situation conducive to divided loyalties and can include situations in which the caliber of an attorney's services may be substantially diluted. In order to obtain substitute counsel because of alleged lack of performance by current counsel, a defendant must show justifiable dissatisfaction with his or her appointed counsel. 302 Kan. at 758-60.

The Sixth Amendment does not guarantee a defendant the right to select which attorney will represent the defendant. A defendant seeking substitute counsel must show "'justifiable dissatisfaction'" with current counsel, which may be demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant. 302 Kan. at 759-60.

Staten presented the district court with an articulated statement of attorney dissatisfaction, which triggered a duty on the part of the court to inquire into potential conflicts of interest.

This duty of inquiry may result in three types of errors, each of which is reviewed for an abuse of discretion. 302 Kan. at 760. The first type of error occurs when a district court becomes aware of a potential conflict of interest but fails to conduct an inquiry. Such a failure constitutes an error of law, that is, a failure to follow the law and fulfill a legal duty. The second type of error occurs when a district court conducts an inquiry but fails to do so in an appropriate manner. An appropriate inquiry requires *fully* investigating both the basis for the defendant's dissatisfaction with counsel and the facts necessary for determining whether the dissatisfaction justifies appointing new counsel. The third type of error may occur when a district court conducts an appropriate inquiry but fails to make a decision that is reasonable in light of the facts that come to the fore. 302 Kan. at 761-62.

The morning of the trial, Staten's counsel, Craig Lubow, informed the court that Staten was submitting a motion for new counsel. Lubow explained that Staten had at some earlier time filed a disciplinary complaint against him, but the Disciplinary Administrator had dismissed it. The court then asked Staten for the basis of his request. He replied with a series of complaints relating to the validity of the arrest warrant, allegedly inconsistent statements by one of the investigating detectives, failure to file motions regarding those issues, and failure to communicate.

After hearing the argument, the trial court denied Staten's motion, holding that he had failed to articulate justifiable dissatisfaction. The court noted that the motions that Staten had filed with respect to the arrest warrant and the detective were without merit.

The pro se motions to which Staten referred consisted of a motion to compel discovery, seeking transcripts of various recordings and hearings for the purpose of helping him prepare a defense; a motion to quash the arrest warrant, asserting that the arresting detective used inconsistent statements of facts to support the issuance of the

warrant; and a motion for judgment of acquittal, based on the allegations contained in the motion to quash. These motions appear to have little bearing on the success of Staten's defense, and they were denied in any event. The failure of the attorney to file the motions on Staten's behalf did not dilute his ability to provide effective representation.

The major point remaining in Staten's request for new counsel was the asserted breakdown of communication. Staten represented to the court that his attorney did not speak with him for several months and only got in touch with him a couple of times in the week before the trial. Staten did not, however, explain how this limited communication worked adversely to the presentation of his defense. "'The focus of the justifiable dissatisfaction inquiry is the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney.'" *Pfannenstiel*, 302 Kan. at 761-62 (quoting *United States v. Baisden*, 713 F.3d 450, 454 [8th Cir. 2013]).

The statements made at the pretrial hearing showed that Staten's disciplinary complaint had been dismissed. It is unclear who dismissed it—Staten, voluntarily, or the Disciplinary Administrator, perhaps as a frivolous complaint. It is also unclear what the basis of the complaint was, although the record suggests that the complaint raised questions of communication.

In *State v. Bryant*, 285 Kan. 970, 992-93, 179 P.3d 1122 (2008), we considered whether filing a disciplinary complaint in itself creates a conflict such that an attorney should be disqualified from further representation of the client filing the complaint. We held that the filing does not necessarily require a district court to replace counsel:

"During the May 18 inquiry, although discussion was sparse on the nature of the disciplinary complaint itself, the court learned that the Disciplinary Administrator had said there was nothing to investigate. Moreover, after discussion with Bryant and

20

McBratney on the nature of Bryant's overall concerns, the court stated that it did not see any conflict requiring her removal. During the November 18 inquiry, although similarly limited on the nature of the second disciplinary complaint itself, the record reveals that the court gave Bryant opportunities to be heard. Several times Judge Burdette asked Bryant to 'give me something specific.' And . . . there is nothing in the record indicating what McBratney's responses to the complaints were, much less any indication that they 'would be contrary' to any position she needed for defending Bryant." 285 Kan. at 992-93.

A court is not required to engage in a detailed examination of every nuance of a defendant's claim of inadequacy of defense and conflict of interest. A single, open-ended question by the trial court may suffice if it provides the defendant with the opportunity to explain a conflict of interest, an irreconcilable disagreement, or an inability to communicate with counsel. *Wells*, 297 Kan. at 755-56.

The district court allowed Staten to make two statements about his dissatisfaction with his appointed counsel. While articulating displeasure with Lubow, Staten did not proffer any specific manner in which Lubow would be unable to present his theory of defense or why some other theory might have been preferable. The court's inquiry sufficed to explore whether Staten's right to counsel was in jeopardy, and the district court did not abuse its discretion in determining that replacing Lubow was not necessary to protect Staten's right to a fair trial.

*Cumulative error*

Finally, Staten argues that the cumulative effect of various trial errors was so prejudicial as to warrant a new trial. When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all errors and, even if those errors individually would be considered harmless, analyzes whether

their cumulative effect is so great that they collectively cannot be determined to be harmless. *State v. King*, 297 Kan. 955, 986, 305 P.3d 641 (2013). While we acknowledge that error occurred in the jury instructions and in the prosecutor's closing argument, the cumulative effect was not so great as to have been prejudicial to Staten's defense or to require a new trial.

CONCLUSION

The judgment of the district court is affirmed, and the judgment of the Court of Appeals affirming the district court is affirmed.