NOT DESIGNATED FOR PUBLICATION

No. 115,562

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DIEGO CARMONA RUIZ,
*Appellant*.

MEMORANDUM OPINION

Appeal from Greenwood District Court; JANETTE L. SATTERFIELD, judge. Opinion filed March 16, 2018. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Amanda G. Voth*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., STANDRIDGE and BRUNS, JJ.

PER CURIAM:  Diego Carmona Ruiz was charged with unlawful cultivation of marijuana, conspiracy to cultivate marijuana, and felony possession of drug paraphernalia for tending to over 1,700 marijuana plants. The defense's strategy at trial revolved around Ruiz' affirmative defense of compulsion. After a jury convicted him, the district court granted Ruiz' motion for a durational departure to 120 months in prison. On appeal, Ruiz claims some of the jury instructions regarding his compulsion defense and the burden of proof were clearly erroneous. He also argues that cumulative errors deprived him of a fair trial, requiring this court to reverse his conviction. For the reasons stated below, we affirm.

1

In August 2014, law enforcement investigated a rural area in Greenwood County, Kansas after receiving a report of a possible grow operation from a tree-cutting crew. They located large plants at various levels of maturity. The plants were in rows, weeds had been pulled, there were paths between the rows of plants, and the area was clear of debris and brush—allowing law enforcement to infer that someone was tending to the plants regularly. They performed surveillance on foot and by air to see whether they could observe any inhabitants.

On August 26, two Kansas Bureau of Investigation (KBI) agents, two agents with Kansas Parks and Wildlife, and two officers with the sheriff's office hiked to the area around 4 a.m. Several other officers were in vehicles in the surrounding area. Using a thermal imaging device, Lieutenant Randy Cox saw human silhouettes inside a tent. Around 6:20 a.m., two males came out of the tent—Ruiz and Jaime Antonio Perez-Hernandez. Both men were detained, and law enforcement secured the area and collected evidence for the KBI. There were indications that the plants had been recently watered, and there were two gas-powered pumps with hoses set up. Officers also located sprayers, pumps, hoses, buckets, pruners, pickaxes, shovels, and hedge clippers. At the campsite, officers found food and various cooking utensils. They also found new packages of socks and underwear, as well as a clothesline. There were only two sleeping bags, located in the same tent. No firearms were found at the site. Law enforcement counted 1,715 marijuana plants.

Law enforcement testified that parts of the marijuana grow were similar to grow operations they believed to be linked to the Mexican Cartel, organizations that often force people to work in marijuana fields against their will or under threat. Other parts, though, were inconsistent, such as the size of the encampment. In encampments in some Mexican Cartel grows, for example, there may be up to 16 sleeping bags in a single structure, or a

centralized place of worship with candles, skulls, and other religious signs or symbols. However, those were not present here.

KBI Special Agent Sherri Moore, who worked in the special operations division on narcotics crimes, interviewed Ruiz at the sheriff's department. Ruiz chose to waive his *Miranda* rights after they were provided to him in Spanish, and he signed a Spanish form indicating his statements were voluntary. During the interview, Ruiz explained that he planted the marijuana plants around May 20, and there were about 1,000 plants. He insisted he planted them by himself and was growing it for himself and not for anyone else. He said that he found the location of the land on the internet and that he learned to grow marijuana when he was in Mexico.

Ruiz told Moore about a working relationship he had with a man named Fernando. According to Ruiz, Fernando was the person who initially drove him to the grow site in Greenwood County. Fernando also helped Ruiz get all of his supplies to the marijuana field. Fernando dropped off food for him and had last been there about 25 days prior. Ruiz paid Fernando $1,000 per month to bring him supplies. Later, though, Ruiz said that Fernando put up the money for the grow operation, bought the supplies, and provided transportation.

When asked about Hernandez—the individual found at the grow site with him— Ruiz said that he met him in Wichita. Fernando picked up Ruiz from the marijuana field and took him back to Wichita to get Hernandez around May 30. Ruiz planned to get a half pound of marijuana from each plant, then take it to Wichita. Hernandez was going to get 40 percent of the marijuana. Ruiz did not tell Moore about anyone else's involvement other than Fernando and Hernandez, and he denied being part of an organization.

The parties ultimately worked out a plea agreement. During the plea hearing in March 2015, the following exchange occurred:

"THE COURT: . . . . Now, I need to make sure your plea is knowing and voluntary. Are you being threatened by anyone outside of the jail that if you don't enter a plea of guilty you might be harmed or your family might be harmed?

"THE DEFENDANT: I don't know how to say it in English. No, I wouldn't like them to bother my family.

"THE COURT: I have to know that you're pleading guilty because you believe you are guilty that you were cultivating marijuana. You were watering it. You were picking it. You knew what it was and you were receiving some benefit for doing it. If you weren't doing any of those things and someone was threatening you to make you plead guilty to something you didn't do, then your plea is not voluntary. It's under duress. And that is what I'm trying to avoid.

. . . .

"THE COURT: Are you under any duress to plead today?

"THE DEFENDANT: Yes.

"THE COURT: You have been threatened by someone?

"THE DEFENDANT: Yes.

"THE COURT: All right. Then I cannot accept his plea."

The district court asked Ruiz if the threats came from law enforcement, and he replied, "Not by the police. Okay. I've been threat—they've been telling me that if I talk they could hurt me or my family." The court said it would ask the sheriff to investigate the threat and did not accept Ruiz' plea.

The case proceeded to trial, and Ruiz testified about how he became involved with the marijuana grow operation. His account at trial was completely different than the account he provided to Moore after he was arrested. At trial, Ruiz said he met a man named Chihuas at a bar in Wichita. Chihuas told Ruiz that he had work for Ruiz tending cattle in Greenwood County. Chihuas took Ruiz to the cattle ranch. After Chihuas showed him the cattle, he then took Ruiz to a different area where there were two men with masks and large guns. When asked why they had masks on, Ruiz responded:

4

"A.   Because they told me they were the kind of people that pick up people. Meaning that they are the ones that force people to go places.

"Q.   So were they forcing you to go with them?

"A.   Yes.

"Q.   And what would they—what did they tell you would happen if you didn't go with them?

"A.   They—they say they will—they will kill me or kill my family."

Chihuas left, and the two masked men gave Ruiz marijuana seeds and helped him plant them. They stayed and helped Ruiz for 10 to 15 days, and when they left, they told Ruiz that he was in charge but could not leave the area. They also claimed that they had cameras in the area. With the irrigation system already set up, the two men left Ruiz with food and two cell phones and said they would be back in a month. The men would call Ruiz every few days to see if he needed anything. They told him that if he was caught by law enforcement, Ruiz should tell the legal authorities that the entire grow operation was his. Ruiz testified that although he could have left, he believed he would be killed if he did.

Ruiz testified that he spoke with his girlfriend frequently and that he told her he was working in oil fields in Oklahoma. Ruiz said that he never told his girlfriend about the men or the marijuana field, that he never asked her for help, and that he did not know that dialing 9-1-1 would put him in contact with the police. Ruiz said that the masked men never hurt him or his family; in fact, Ruiz conceded that the masked men never indicated that they knew the identity of his family members. Ruiz testified that Hernandez arrived 10 to 15 days after the masked men left the campsite.

Ruiz addressed the differences between his in-court testimony and his interview with Agent Moore. He said that the answers he provided to Moore were made up because the masked men told him to lie about their involvement in the operation. He complied with this directive because he feared for his safety and for the safety of his family. When

5

asked, Ruiz said he did not know why the men would have entrusted him with this operation when they did not know him. Ruiz also testified that he was somewhat relieved when he was arrested because he was no longer "in danger of these guys doing something to [him] anymore." When asked why he would tell the truth at trial when he did not before, he responded, "[B]ecause now I'm facing some really long time in custody and I would rather tell the truth."

During the trial, Ruiz never denied that he planted, watered, and otherwise tended to the marijuana plants and facilitated the grow operation. Instead, the defense relied on a compulsion defense. The district court provided instructions to the jury regarding Ruiz' compulsion defense. Ruiz did not object to any of the jury instructions provided. The jury ultimately convicted Ruiz on all three counts charged.

ANALYSIS

On appeal, Ruiz argues the instructions provided to the jury on the affirmative defense of compulsion were legally deficient in three distinct ways, each of which constitutes clear error requiring his convictions to be vacated. First, with regard to jury instruction 12, Ruiz argues the district court erred as a matter of law by defining the affirmative defense of compulsion in a manner that went beyond that recommended in the Pattern Instructions Kansas (PIK). Second, Ruiz argues the district court erred as a matter of law by providing language in jury instruction 13 that the jury "should" consider evidence supporting his affirmative defense of compulsion instead of instructing the jury that it "must" consider such evidence in determining whether the State has met its burden to prove him guilty. Third, Ruiz argues the district court erred by failing in jury instruction 13 to expressly instruct the jury that the State had the burden to disprove Ruiz' claim of compulsion beyond a reasonable doubt.

6

When analyzing jury instruction issues, appellate courts make three determinations: (1) whether the issue can be reviewed, (2) whether any error occurred, and (3) whether any error requires reversal. *State v. Barber*, 302 Kan. 367, 376, 353 P.3d 1108 (2015). On the first issue—reviewability—we find Ruiz did not lodge an objection with the district court on any of the instructions he now challenges. But Ruiz' failure to assert this challenge below is not fatal to his claim. K.S.A. 2017 Supp. 22-3414(3) states:

"No party may assign as error the giving or failure to give an instruction, . . . unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous."

Accordingly, this court reviews for clear error the instructions Ruiz now challenges on appeal. See *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012). To establish clear error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.'" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

Having determined we can review the jury instructions challenged by Ruiz, we move on to the second determination: whether there was any error in the instructions provided. To make that determination, we consider whether the instruction provided was legally and factually appropriate, employing an unlimited review of the entire record. *Williams*, 295 Kan. 506, Syl. ¶ 4. Legal appropriateness is whether the instruction fairly and appropriately states the applicable law. Like all questions of law, this court employs an unlimited standard of review. To determine whether the jury instruction was factually appropriate, this court determines if there was sufficient evidence, viewed in the light most favorable to the requesting party, to support a factual basis for the instruction. *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

If this court finds that there was an error (that the instructions provided were legally or factually inappropriate), then we proceed to a reversibility inquiry. In this case, Ruiz did not object to the instructions given. Thus, the reversibility inquiry requires us to employ what is commonly called the "clear error" test. An instruction is clearly erroneous when "'the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *Barber*, 302 Kan. at 377; see *Williams*, 295 Kan. 506, Syl. ¶ 8. Whether instructional error is clearly erroneous requires review of the entire record and de novo determination. The burden of showing clear error belongs to the complaining party. 295 Kan. at 516.

1. *Jury instruction 12*

The affirmative defense upon which Ruiz relied in this case was compulsion, the requirements of which were set forth in jury instruction 12:

"**INSTRUCTION NO 12**

"Compulsion is a defense if the defendant acted under the compulsion or threat of imminent infliction of death or great bodily harm, and he reasonably believed that death or great bodily harm would be inflicted upon him or upon his spouse or child if he did not act as he did.

"Such a defense is not available to one who intentionally or recklessly placed himself in a situation in which he would be subjected to compulsion or threat.

"The defense of compulsion requires coercion or duress to be present, imminent, impending and continuous. It may not be invoked when the defendant had a reasonable opportunity to escape or avoid the criminal act without undue exposure to death or serious bodily harm."

Ruiz argues the district court erroneously added two unnecessary paragraphs to the standard instruction set forth in the PIK and that doing so amounts to clear error requiring reversal of his convictions.

8

a. *The second paragraph*

The second paragraph essentially mirrors the language of a bracketed portion of the PIK instruction on compulsion, and is taken directly from K.S.A. 2017 Supp. 21-5206(b). That subsection of the statute states that "[t]he defense provided by this section is not available to a person who intentionally or recklessly places such person's self in a situation in which such person will be subjected to compulsion or threat." K.S.A. 2017 Supp. 21-5206(b). The "Notes on Use" section states that the bracketed portion of the PIK instruction "should be used only when there is some evidence indicating that the defendant intentionally or recklessly placed himself or herself in the situation indicated." PIK Crim. 4th 52.080 (2016 Supp.).

Kansas courts have found the language used in the second paragraph to be legally appropriate, finding that a compulsion defense is not available to a person who places himself or herself in a situation in which it is probable a compulsion will occur; thus, "'a person who connects himself or herself with criminal activities or is otherwise indifferent to known risks cannot use compulsion as a defense.'" *State v. Littlejohn*, 298 Kan. 632, 652, 316 P.3d 136 (2014) (quoting *State v. Scott*, 250 Kan. 350, Syl. ¶ 6, 827 P.2d 733 [1992]). And again, the language is taken directly from K.S.A. 2017 Supp. 21-5206(b); thus, we find the second paragraph of the instruction to be legally appropriate.

The bracketed portion of the PIK instruction was factually appropriate in this case as well. There was evidence presented to the jury that Ruiz placed himself in a situation in which he would be subjected to compulsion or threat. Ruiz told Agent Moore that he arrived around May 20 and planted the marijuana plants on his own. He advised Moore that he found the location for the marijuana grow on the internet. He advised that he had been working in a restaurant, but he wanted to grow marijuana. He knew how to grow marijuana from his time in Mexico. Ruiz advised that a friend of his dropped off food and supplies.

9

At trial, Ruiz testified he met a man named Chihuas at a bar; Ruiz only had met him on that single occasion. Ruiz gave Chihuas his phone number. Chihuas was going to hire Ruiz to care for dairy cattle, even though the only experience Ruiz had with cattle was milking them by hand. Chihuas was going to pay him $1,000 for two weeks. The two men were supposed to meet at an intersection in Wichita, and then Chihuas was supposed to drive him to take care of cattle, according to Ruiz' testimony. However, Ruiz did not pack a bag, even though he knew he would be there a while and he did not know where he would be staying.

If the jury believed Ruiz' interview, there actually was no compulsion when Ruiz found the site for the marijuana grow operation on the internet, went there himself, and planted and cared for the marijuana plants. But even if the jury believed Ruiz' trial testimony, there is evidence from which the jury could find that Ruiz recklessly placed himself in a situation in which he would be subjected to compulsion or threat when he met a man one time and gave the man his phone number, and then met the man at an intersection in Wichita. Ruiz did not pack a bag of clothes or personal items, but instead blindly met up with a man he barely knew, on the promise that Ruiz would work at some undisclosed location for a two-week period of time. The second paragraph of the instruction was factually appropriate.

b. *The third paragraph*

The third paragraph, although not taken directly from the PIK, is also factually and legally appropriate. Courts may add to or deviate from PIK instructions when necessary. *State v. Appleby*, 289 Kan. 1017, 1060-61, 221 P.3d 525 (2009).

The language was legally appropriate based on a long line of Kansas precedent holding that the doctrine of compulsion cannot be invoked by one who had a reasonable opportunity to escape or avoid the criminal act without undue exposure to death or

10

serious bodily harm. See *State v. Baker*, 287 Kan. 345, 358, 361, 197 P.3d 421 (2008) (because defendant was away from threatening party for 10 minutes, no compulsion instruction was required; no rational fact-finder could conclude that reason for defendant's failure to escape from compulsion was because of lack of reasonable opportunity to do so); see also *State v. Jackson*, 280 Kan. 16, 28-29, 118 P.3d 1238 (2005); *State v. Crawford*, 253 Kan. 629, 639, 861 P.2d 791 (1993); *State v. Myers*, 233 Kan. 611, 615-16, 664 P.2d 834 (1983). In *Baker*, the court noted that its interpretation of compulsion has expanded the statutory factors in repeatedly holding that

> "'to constitute the defense of compulsion, *coercion or duress must be present*, *imminent*, *impending*, *and continuous*. It must be of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to oneself or one's family if the act is not done. *The doctrine of compulsion cannot be invoked as an excuse by one who had a reasonable opportunity to escape the compulsion or avoid doing the act without undue exposure to death or serious bodily harm*. A threat of future injury is not enough. [Citations omitted.]' (Emphasis added.) *State v. Matson*, 260 Kan. 366, 385, 921 P.2d 790 (1996)." 287 Kan. at 352.

The language in the third paragraph also was factually appropriate in this case based on the conflicting evidence about whether Ruiz had a reasonable opportunity to escape and whether he could have sought out safety. At trial, Ruiz testified that a man named Chihuas, who he met at a bar in Wichita, took him to a field in Greenwood County to take care of cattle, but then took Ruiz to a different location where there were two masked men with weapons. Ruiz testified the two men helped him plant the marijuana seeds for 10 to 15 days, and told him that he could not go farther away than a 2-mile radius. They allegedly told Ruiz that they had cameras in the area, although Ruiz never saw any. The men left Ruiz in charge of the operation, and said they would be back in a month. They left Ruiz with cell phones, and called every few days to check up on him. Ruiz spoke to his girlfriend numerous times while he was out in the field and never

11

asked her for help. Finally, Ruiz testified that the men never hurt Ruiz and would not have known the identity of his family.

Even if the jury gave some credit to Ruiz' trial testimony, there is still evidence from which the jury could have found that Ruiz had a reasonable opportunity to escape. Ruiz was out in a rural location for about three months. If one believes that there were two masked and armed men, they left after 10 to 15 days and said they would not return for a month. Additionally, it seems illogical that the men would have so many cameras up that they could cover Ruiz' movements for a 2-mile radius. Moreover, there is no evidence that Ruiz was continuously intimidated, if he was at all. Ruiz had hours upon hours, days upon days, weeks upon weeks, and months upon months to escape the marijuana field. Additionally, he had two cell phones. On any of the numerous occasions he spoke with his girlfriend, he could have told her that he was in trouble. He could have called for help. The evidence showed no present, imminent, impending, or continuous compulsion or duress; accordingly, providing the language in the third paragraph of the instruction was factually appropriate.

Because the second and third paragraphs are both factually and legally appropriate, it was not error for the district court to include them in the instruction.

2. *Jury instruction 13*

The instruction about which Ruiz complains in this claim of error is jury instruction 13, which stated:

**INSTRUCTION NO 13**

"The defendant raises compulsion or threat as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

12

This language mirrors PIK Crim. 4th 51.050 (2013 Supp.). The "Notes on Use" advise that the instruction should be given in connection with the instruction regarding the applicable affirmative defense, which in this case was jury instruction 12 discussed in the previous section.

Ruiz concedes that jury instruction 13 was factually appropriate as it was a PIK instruction that he requested. He argues, however, that the instruction was legally inappropriate because (a) the instruction should state that the jury "must" consider the evidence of compulsion, instead of using the word "should" and (b) the instruction failed to expressly instruct the jury that the State had the burden to disprove the defendant's claim of compulsion beyond a reasonable doubt. We address each of these arguments in turn.

a. *"Should" instead of "must"*

The crux of Ruiz' first claim of error on appeal is that the language in jury instruction 13 should have used the word "must" instead of "should." He argues the term "should" is only advisory in nature; thus, the court was required to use the term "must" in order to properly communicate to the jury that it was legally obligated to consider evidence presented that supported his affirmative defense.

To be legally appropriate, the requested instruction must fairly and accurately state the applicable law and it must be supported by the particular facts of the case. *Plummer*, 295 Kan. at 161. As previously stated, PIK instructions should be used, absent a need to alter jury instructions based on specific facts of a case. *Allen*, 52 Kan. App. 2d at 734. The instruction in this case is identical to the instruction provided in PIK Crim. 4th 51.050.

Based on analogous precedent, we find PIK Crim. 4th 51.050 (jury instruction 13) in this case to be legally appropriate. In *State v. Mitchell*, 269 Kan. 349, 7 P.3d 1135 (2000), the court instructed the jury that it *should* not consider the fact that the defendant did not testify in arriving at its verdict. The PIK instruction recommended that the court instruct the jury that it *must* not consider the fact that the defendant did not testify in arriving at its verdict. The jury convicted the defendant. On appeal, the defendant argued that the court erred by using the term "should" in the instruction instead of the term "must." But the *Mitchell* court rejected the defendant's claim, holding "[t]he jury was instructed that it was not to consider the fact that Mitchell did not testify, and the use of the word 'should' instead of the word 'must' did not significantly alter the meaning of the instruction so as to prejudice Mitchell." 269 Kan. at 357.

Ruiz points out that this court has recently held that "should" is advisory. *Allen*, 52 Kan. App. 2d at 736. However, this alone does not render the jury instruction legally inappropriate. Use of the word should "'denotes the proper course of action and encourages following the advised path.'" 52 Kan. App. 2d at 735. The Kansas Supreme Court has held that "it is the proper function and duty of a jury to accept the rules of law given to it in the instructions by the court, apply those rules of law in determining what facts are proven and render a verdict based thereon." *State v. McClanahan*, 212 Kan. 208, 217, 510 P.2d 153 (1973). In this case, the instruction properly guided the jury as to what it needed to consider when coming to its verdict. The use of "should" did not significantly affect the instruction.

But even if it was error to use "should" rather than "must" in jury instruction 13, such an error is not clear error requiring reversal. To establish clear error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.'" *Cooper*, 303 Kan. at 771. In conducting a clear error analysis, we may examine the entirety of the record, including comments by counsel, jury instructions, and the evidence presented at trial, while reviewing Ruiz' claim. "An

14

appellate court examines jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury." *State v. Williams*, 42 Kan. App. 2d 725, Syl. ¶ 1, 216 P.3d 707 (2009); see *State v. Hilt*, 299 Kan. 176, 184-85, 322 P.3d 367 (2014).

The Kansas Supreme Court previously has determined that although "must" may be of better practice in some cases, the use of "should" is not an error requiring reversal. See *State v. Pennington*, 254 Kan. 757, 764, 869 P.2d 624 (1994) (finding better practice would have been for district court to use stronger term "must" instead of term "should" as requested by defendant but holding any error was harmless and did not prejudice defendant; in other words, there was no reasonable possibility that error affected jury's guilty verdict); *State v. Johnson*, 255 Kan. 252, 259, 874 P.2d 623 (1994); *State v. Whitaker*, 255 Kan. 118, Syl. ¶ 5, 872 P.2d 278 (1994); *State v. Owens*, 248 Kan. 273, 284, 807 P.2d 101 (1991). And in this particular case, jury instruction 15 (mirroring PIK Crim. 4th 68.010) stated that the verdict "must be founded entirely upon the evidence admitted and the law as given in [the] instructions."

In sum, although it may have been the better practice for the district court judge to use the stronger term "must" instead of the term "should" in the context of this instruction, we find PIK Crim. 4th 51.050 (jury instruction 13) provided sufficient direction for the jury to consider the evidence in support of Ruiz' compulsion defense, that the instruction properly and fairly states the law as applied to the facts in the case, and that the jury could not reasonably have been misled by the instructions. See *Plummer*, 295 Kan. at 161; *Williams*, 42 Kan. App. 2d 725, Syl. ¶ 1. And even if a failure to use the term "must" instead of the term "should" rendered the instruction legally insufficient, we are not firmly convinced that using the term "must" in the instruction would have made a difference in the verdict. See *Cooper*, 303 Kan. at 771.

15

b. *The burden of proof*

Ruiz' second contention also involves jury instruction 13. Again, the instruction read:

> "**INSTRUCTION NO 13**
>
> "The defendant raises compulsion or threat as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

This instruction follows PIK Crim. 4th 51.050.

Ruiz concedes that he did not object to or request an instruction different than the one provided to the jury. Therefore, our review is limited to a determination of whether the instruction was clearly erroneous under the two-step standard set forth above. Both parties agree that the instruction was factually appropriate; Ruiz requested an instruction on his defense, the State did not object, and the court provided one. Therefore, to complete the first step of the clear error analysis, this court is left to determine whether the instruction is legally appropriate.

Ruiz asserts that to provide a legally appropriate jury instruction on the State's burden of proof for the affirmative defense of compulsion, the district court had to expressly instruct the jury that the State had the burden to disprove the defendant's claim of compulsion beyond a reasonable doubt under K.S.A. 2017 Supp. 21-5108(c), which states:

> "A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies. Once the defendant

16

satisfies the burden of producing such evidence, the state has the burden of disproving the defense beyond a reasonable doubt."

Ruiz acknowledges in his brief that the Kansas Supreme Court has found that not giving what is now PIK Crim. 4th 51.050 is error, but not clearly erroneous. See *State v. Cooperwood*, 282 Kan. 572, 582, 147 P.3d 125 (2006); *State v. Crabtree*, 248 Kan. 33, 40-41, 805 P.2d 1 (1991). Ruiz further acknowledges that these decisions were followed by a panel of our court in *State v. Staten*, No. 108,305, 2015 WL 423644, at *8-10 (Kan. App. 2015) (unpublished opinion), *aff'd* 304 Kan. 957, 377 P.3d 427 (2016). But Ruiz asserts these cases no longer control now that K.S.A. 2017 Supp. 21-5108 (and K.S.A. 2017 Supp. 21-5206) makes the law clear. Specifically, Ruiz argues "[i]t is time for our appellate courts to stop holding that PIK Criminal 4th 51.050 gives jurors any guidance, especially because it fails to state the law."

Conspicuously missing from Ruiz' brief, however, is the fact that the Court of Appeal's decision in *Staten* was affirmed by our Supreme Court on August 12, 2016, more than 10 months before Ruiz filed his brief in this case. In *Staten*, the district court instructed the jury on the crime charged, the theory of self-defense, and the State's general burden of proof in a criminal case. Staten asserted on appeal that the district court erred because it did not instruct the jury that the State must prove beyond a reasonable doubt that he did not act in self-defense. In assessing Staten's claim on appeal, our Supreme Court interpreted K.S.A. 2015 Supp. 21-5108(c) and found Staten's assertion correct regarding the State's burden of proof for self-defense—the State must disprove self-defense beyond a reasonable doubt—but reasoned that the Legislature's enactment of K.S.A. 2015 Supp. 21-5108(c) did not alter Kansas law:

> "This amendment codified the caselaw requirement that, once a defendant properly asserts a self-defense affirmative defense, the State must disprove that defense beyond a reasonable doubt. The amendment did not alter the law in Kansas concerning the State's burden of proof, and it did not create a new element that the State must prove

17

when charging a crime. Statutory self-defense is a rebuttable defense to certain crimes, as it was before the amendment. [Citations omitted.]" 304 Kan. at 965-66.

The *Staten* court ruled that appellate courts—even after the enactment of K.S.A. 2015 Supp. 21-5108(c)—must continue to review jury instructions as a whole to determine if "everything necessary for the jury to consider the burden of proof was contained within the instructions." 304 Kan. at 966. Notably, the *Staten* court did not find that the district court erred based on a failure to expressly instruct the jury using the statutory language in K.S.A. 2015 Supp. 21-5108(c); instead, the court found the jury instructions were not clearly erroneous. 304 Kan. at 967.

We now review the district court's jury instruction on the affirmative defense of compulsion and the State's burden of proof as a whole to determine if the instructions fairly and accurately stated the applicable law. Our review begins with jury instruction 2, the general burden of proof instruction, from PIK Crim. 4th 51.010:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

Jury instruction 5 informed the jury what the State was required to prove for unlawfully cultivating a controlled substance:

"The defendant is charged with unlawfully cultivating a controlled substance. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

18

"1. The defendant cultivated marijuana.

"2. The defendant did so intentionally and knowingly.

"3. The number of marijuana plants cultivated was 100 or more.

"4. This act occurred on or between May 1, 2014 to August 26, 2014 in Greenwood County, Kansas.

"It is not a defense that the defendant was acting as an agent on behalf of any other party in a transaction involving a controlled substance, did not know the quantity of the controlled substance, or did not know the specific controlled substance involved.

"'Cultivate' means the planting or promotion of growth of five or more plants which contain or can produce controlled substances."

Jury instruction 7 informed the jury what the State was required to prove for conspiracy to unlawfully cultivating a controlled substance:

"The defendant is charged with conspiracy to unlawfully cultivating a controlled substance. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1.  The defendant agreed with another person to commit or assist in the commission of cultivation of marijuana.

"2.  The defendant did so agree with the intent that cultivation of marijuana be committed.

"3.  The defendant or any party to the agreement acted in furtherance of the agreement by cultivating 100 or more marijuana plants.

"4.  This act occurred on or between May 1, 2014 to August 26, 2014, in Greenwood County, Kansas.

"The definition of cultivation of marijuana is set forth in Instruction No. 5 and 6."

Jury instruction 9 informed the jury what the State was required to prove for unlawfully possessing with intent to use drug paraphernalia:

"The defendant is charged with unlawfully possessing with intent to use drug paraphernalia. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

19

"1. The defendant used, possessed with the intent to use: plant sprayers, pumps, irrigation hoses and pruning shears, as drug paraphernalia to cultivate, plant, propagate or harvest marijuana.

"2. This act occurred on or between May 1, 2014 to August 26, 2014, in Greenwood County, Kansas.

"'Cultivate' means the planting or promotion of growth of five or more plants which contain or can produce controlled substances.

"'Possession' means having joint or exclusive control over an item with knowledge of and the intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control."

Jury instruction 12 informed the jury about the affirmative defense of compulsion:

"Compulsion is a defense if the defendant acted under the compulsion or threat of imminent infliction of death or great bodily harm, and he reasonably believed that death or great bodily harm would be inflicted upon him or upon his spouse or child if he did not act as he did.

"Such a defense is not available to one who intentionally or recklessly placed himself in a situation in which he would be subjected to compulsion or threat.

"The defense of compulsion requires coercion or duress to be present, imminent, impending and continuous. It may not be invoked when the defendant had a reasonable opportunity to escape or avoid the criminal act without undue exposure to death or serious bodily harm."

Finally, jury instruction 13 stated the burden of proof regarding the affirmative defense of compulsion:

"The defendant raises compulsion or threat as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The States' burden of proof does not shift to the defendant."

20

Based on our review of the jury instructions as a whole, the district court provided legally appropriate instructions on the State's burden of proof, and the district court's jury instructions follow the current wording of the PIK instruction and the applicable law on each issue. See PIK Crim. 4th 52.080 (2016 Supp.) (defense of compulsion); PIK Crim. 4th 57.100 (2015 Supp.) (unlawfully possessing with intent to use drug paraphernalia); PIK Crim. 4th 53.030 (2014 Supp.) (conspiracy to unlawfully cultivate a controlled substance); PIK Crim. 4th 57.021 (2013 Supp.) (unlawfully cultivating a controlled substance); PIK Crim. 4th 51.050 (burden of proof defenses); PIK Crim. 4th 51.010 (State's burden of proof); see also *Baker*, 287 Kan. at 352 (to constitute defense of compulsion, coercion or duress must be present, imminent, impending, and continuous and defense cannot be invoked by one who had reasonable opportunity to escape or avoid doing act without undue exposure to immediate death or serious bodily harm). And, unlike in *Staten*, where the court found the district court committed instructional error (but not clear error) by failing to give the affirmative defense burden of proof instruction contained in PIK Crim. 4th 51.050, the district court here did include such an instruction.

Because the jury instructions provide an accurate statement of the law on the theory of self-defense and the State's burden of proof when viewed as a whole, we find the jury instructions legally appropriate.

3. *Cumulative error*

The test for cumulative error is whether the totality of the circumstances establishes that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. In asserting the cumulative effect of errors during the trial, the appellate court should examine the errors in context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014); see *State v. Walker*, 304 Kan. 441, 457-58, 372

21

P.3d 1147 (2016). If any errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. *State v. Santos-Vega*, 299 Kan. 11, 27-28, 321 P.3d 1 (2014).

Here, there is no indication that cumulative errors deprived Ruiz of a fair trial. The court will find no cumulative error when the record fails to support the errors the defendant raises on appeal. *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015). Additionally, a single error cannot constitute cumulative error. *State v. Love*, 305 Kan. 716, 737, 387 P.3d 820 (2017). Here, none of the complained-of jury instructions were erroneous; therefore, there can be no cumulative error. All of the instructions were factually and legally accurate, and they followed the PIK instructions.

Affirmed.