NOT DESIGNATED FOR PUBLICATION

No. 118,824

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL ANTHONY ALLEN,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed May 10, 2019. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., SCHROEDER, J., and STUTZMAN, S.J.

PER CURIAM:  On July 19, 2017, a jury in Shawnee County District Court convicted Michael A. Allen of aggravated battery, a severity level 4, person felony. The district court sentenced Allen to serve 162 months in prison, followed by 36 months under postrelease supervision. This sentence was ordered to be consecutive to two prior cases. Allen appeals his conviction.

FACTS AND PROCEDURAL BACKGROUND

On January 17, 2017, Allen entered the Kanza building at Stormont Vail Hospital. He remained in a hallway for about a half hour. Christopher Buesing, an employee of

1

Stormont Vail Health, was in the Kanza building awaiting delivery of food for a catered lunch meeting. When the food arrived, Buesing walked toward the back door while looking at his phone. Allen walked up to him and punched him in the face. Buesing fell to the floor, in great pain, and later remembered someone digging in the pockets of his pants and claiming Buesing had bumped into that person. Buesing began to yell for help. Allen's blow had broken Buesing's jaw and three of his teeth.

There were no witnesses to the attack, but video surveillance cameras recorded the incident. Seconds after he had been hit, Buesing became aware that Allen had attacked him and still was standing over him. Steve McGrath responded to Buesing's cries for help. He testified that when he got to Buesing, Allen was standing over Buesing, who was holding his jaw. Buesing said Allen had hit him, which Allen denied. Allen said he and Buesing had bumped into each other and "cracked heads." McGrath asked Allen why he was there, and Allen replied he was there to visit a friend in "neuro" who had an appointment. McGrath testified Allen communicated clearly and coherently in this interaction.

Officers from the Topeka Police Department were called to the scene. Believing that Allen may have attacked Buesing, therapists working in the Kanza building detained Allen until police arrived. Officer William Thompson responded first. Thompson found Allen sitting on a bench and Buesing in a separate room. Allen told Thompson he did not know why police were there since he and Buesing had only bumped into each other accidentally as Allen was going around the corner to go see his friend Snoop. The recording from a bodycam showed Allen's interaction with officers and Kanza building staff. In Thompson's opinion, Allen responded coherently to his questions and, based on his experience, Allen did not appear to be intoxicated or impaired. At the end of their conversation, police took Allen to Valeo Behavioral Health Care, because he told Thompson he was tired of feeling the way he did.

2

On January 25, 2017, the State charged Allen with one count of aggravated battery. Allen was arraigned in February and a trial was set for July 17, 2017. Four months after arraignment and less than a month before trial, Allen filed a notice of intent to subpoena business records from Valeo Behavioral Health Care. He then filed a motion for continuance about one week after the deadline specified in the business records subpoena and about one week before trial. As justification for the continuance, Allen cited Valeo's failure to comply with the subpoena and the State's failure to comply with discovery requests. At a hearing on the motion, the district court asked when Allen became aware of potential defenses and what efforts had been taken to secure witnesses and evidence. The district court expressed concern that the defenses and difficulty getting evidence had not been raised previously, including at the pretrial hearing over a month earlier, and denied the motion.

On the same day as the motion hearing, both parties filed proposed jury instructions. Allen's submission included two instructions on lesser included crimes. The State proposed no instructions for lesser offenses.

During voir dire, Allen presented the jury with a hypothetical story about a silver teapot in space, apparently intended to symbolically illustrate an aspect of the burden of proof. He said:

> "Now, I don't want to hammer this point, but I—it's something that's a philosophical question and it's about ultimately burden of proof. When you're making an argument, I think it's called a silver tea pot. I don't know if you've ever heard—anybody heard of this? So I can tell you that there's a silver tea pot in space, right now, orbiting earth. I have the burden right, to prove that to you. You can say, 'I don't believe you.' 'Maybe not true.' If I wanted you to believe that, I'd have to do that and that would be kind of difficult. Tea pot's small. You know, there's—it would be very difficult to find ways to prove to you that that's the case.
> "What if you say 'prove to me that that tea pot doesn't exist,' 'cause that would be really hard. That would be really, really hard. How would you go about disproving the

3

existence of this tea pot? I mean, would you put telescopes up in the air, have them scan the skies for hours and hours. [*sic*] How many man hours would it take to do that? Sometimes criminal cases are a little bit like that. Not everybody's in a position where they're going to be able to provide evidence to prove their innocence."

The State presented four witnesses over two days. The first was McGrath, the bystander who responded to Buesing's call for help. McGrath gave his account of the events and testified that during the 5 to 10 minutes of his encounter with Allen, he was coherent and communicated clearly and did not ask for help.

Next, the State called Buesing, the victim. Buesing testified about his activities immediately before, during, and after the attack. Buesing explained that he had looked at his phone, saw that his catering order had arrived, and started to walk toward the door to meet the delivery driver. He said he remembered "feeling a large pain, almost an electric shock to my face." When Buesing had regained his bearings, he found himself on the floor with Allen standing over him saying something along the lines of "you bumped into me" while he dug around in Buesing's pockets. Buesing then testified about the medical treatment and ongoing consequences of his injury. Buesing's broken jaw had to be set and was wired shut for six weeks, requiring a complete liquid diet. Because of difficulties following the removal of the wires, Buesing was evaluated by multiple doctors and had a further surgery to re-break his jaw. As a result, his jaw was again wired shut at the time of his testimony at trial and he was again restricted to a liquid diet. The State offered several photographs of Buesing's injury and treatment, which were admitted without objection.

The third witness was Steve Taylor, the security manager for Stormont Vail Hospital. Taylor testified about the video surveillance system at the Kanza building and identified photographs of the area where the attack took place. The State offered photographs and a video surveillance recording, which were admitted without objection.

4

The final witness in the State's case was Thompson, who offered his account as described above. Video recorded on Thompson's Axon bodycam was authenticated, offered, and admitted into evidence.

At the beginning of Allen's cross-examination of Thompson, there was a bench conference to discuss the admissibility of a 911 call log. The State had previously agreed to stipulate to foundation but told Allen it would object on the basis of relevance. When the time came, the State did object for that reason. The logs purportedly contained notes about Allen's behavior and having been to Valeo and released. The State argued that the material in the call log got into mental health issues. At the motion hearing the week before, the State had contended the information Allen said he still needed to obtain— from Valeo—related to a mental disease or defect defense, and Allen had not given the statutory notice of intent to claim that defense. Allen argued that the evidence should be admissible because the State stipulated to foundation. The district court asked whether Thompson would have direct knowledge of the contents of the call log and Allen acknowledged he would not. The discussion between the court and Allen continued:

> "THE COURT: So you're going to—if you're going to go that direction, you're going to have to do it with a different witness, and then your objections can be renewed. I don't know how it's going to come in, in the defendant's case in chief, but this would not be the proper witness to put that information before the jury.
> ". . . .
> "THE COURT: You'd probably like to introduce it without any witness, wouldn't you?
> "[DEFENSE COUNSEL]: Well, sure, but, you know, the reason I asked about a foundation objection, so the question of whether or not I can—if he's going to object on foundation. If there was an issue, I would have called—
>
> "THE COURT: You're going to have [to] do that in your case in chief.
> "[DEFENSE COUNSEL]: Okay."

5

During cross-examination, Thompson testified Allen did not appear to be intoxicated on the day of the attack. But Thompson did confirm that he wrote in his report that Allen was hallucinating, seeing organisms in the lines in the carpet, and that people were trying to kill him because he had a cure for AIDS. Thompson explained that he frequently encountered individuals with mental health defects in the area who were not intoxicated. After Thompson's testimony, the State rested.

Allen proceeded with his case in chief, calling two witnesses and offering one recording into evidence. His first witness was Officer Conrad Unruh. Unruh testified about an encounter he had with Allen before the attack. The encounter took place in a business that Allen had wandered into asking for someone to call 911. When Unruh responded and was conversing with Allen, Allen appeared to be talking to an area that did not have any person present. Unruh did not believe that Allen was under the influence of alcohol but thought that an organic or substance-based condition may have been affecting him. Allen remained cordial during the interaction and voluntarily agreed to be transported to Valeo. While being escorted to the police car, Allen became reluctant and picked up a piece of concrete and insisted on carrying it with him. Another officer placed the concrete into the back of the police car to alleviate Allen's concerns. Unruh testified that Allen refused to complete the voluntary intake process, so he was released because the police had no reason to hold him.

On cross-examination, Unruh explained that he was able to talk Allen into leaving the business location where the call started and that no force was required during the entire encounter. Allen appeared to leave the business voluntarily to avoid the potential consequences that would follow if he did not leave. Allen was never threatened or handcuffed during the encounter. He voluntarily left the business, entered the police car, and chose Valeo as a destination from the options that were offered to him.

6

Allen then testified. He said on the day of the attack he had been homeless for two days. He had been sitting in a park cold and tired, and he got up to move around. He said he saw a man smoking and asked to bum a cigarette but received a partially smoked "cigar/cigarette" instead. Allen said he walked for about a block, smoking what he was given, but then noticed "[his] body and [his] mental starting changing." Allen admitted having smoked marijuana but testified this did not feel like that. He said that he then started panicking and seeking help, knocking on doors, and eventually ended up inside a business on Topeka Boulevard. Allen asked the employees in the store to call 911, which they did, and he began seeing things others were not seeing and he was "going in and out of cloudy consciousness," "becoming mentally confused."

Allen's counsel offered into evidence a recording of the 911 call from Allen's stop at the business. It was admitted and published without objection. The recording included Allen making statements about receiving messages from God. Allen was able to identify his voice, but testified he had no recollection of talking on the phone or saying the things in the recording. Allen testified that he only recalled bits and pieces of the events that took place after the phone call, but he did recall going to and leaving Valeo prior to the attack on Buesing.

Allen testified that he was "scared," "paranoid," and "seeing things" when he went to the Kanza building. He claimed he was terrified and was trying to avoid the things he was seeing. Allen said that he was not aware that he struck Buesing and believed that he had accidentally bumped into him while trying to get away from what he was seeing. Allen explained that he did not attempt to leave the area because he was unaware he had done anything wrong. When explaining what he recalled, Allen said:

> "That hurt me so bad yesterday to see that that man's still going through what he's going through. That hurt me. Because this is not something that I would walk out and just do to somebody. I care about people. I was under the influence and I asked for help, and I didn't get the proper help.

7

"It's not about me. It's about him. And I wish I could take that back, so bad. My day was so messed up yesterday, everybody was coming to me talking about, it's going to be all right. That's how much compassion and sympathy I had for that man. I would never want anybody, anybody, to have to go through what he's went through. My bad day became his bad day, and I would take that back if I ever had the chance to."

Before cross-examination, a conference was held outside the jury's presence. The State argued Allen had placed his character for peacefulness at issue by commenting on his compassion and sympathy. The State wanted to bring in Allen's prior convictions for violent crimes to impeach Allen and rebut the assertion of good character. Allen argued the comments did not refer to a character trait for peacefulness. The district court ruled Allen's testimony constituted an introduction of his good character into the case, which allowed the State to present evidence of past violent convictions, including domestic battery, criminal restraint, voluntary manslaughter, and third-degree assault. In response to the State's questions, Allen acknowledged he had been previously convicted of those crimes. Allen also admitted to having lived in Topeka for a substantial time before the attack on Buesing, though he said he left and had returned to Topeka only two days before the attack.

Both parties rested and the court took up the issue of proposed instructions with counsel and Allen, outside the jury's presence. The State argued there should be no instruction for involuntary intoxication, but the district court disagreed and included that in the instructions as Allen requested. The district court did not include an instruction on a lesser included offense in its draft packet. The court asked Allen's counsel whether he was requesting one at that time and counsel said he was not.

In argument, the State addressed its burden of proof:

"Instruction No. 2, very important. As I said they're all important, but this is the burden of proof instruction. It's my burden, it's the State's burden, to prove to you beyond a reasonable doubt this defendant committed the acts complained of. That's a high

8

burden, we talked about that, but it's not an impossible burden. It's beyond a reasonable doubt. Not beyond all doubt. Not beyond all possibilities. Not did I disprove every possible scenario, but did I prove to you beyond a reasonable doubt what happened on January 17th, 2017.

    . . . .

"The real issue in this case comes down to knowing. Did the defendant knowingly commit this act? You heard [defense counsel] tell you in his opening statement that this was a case of involuntary intoxication, and you get that instruction in here as well. Involuntary intoxication. This does not shift the burden of proof to the defendant. So even though the defendant's claiming involuntary intoxication, that doesn't negate my burden. But you have to look at the evidence that you have when considering involuntary intoxication."

And Allen also reminded the jury of the State's burden:

"Remember the State has the burden of proof. They have to prove all those elements. And if there's any question that you have about what happened, if you wanted to hear a piece of evidence, if you wanted to hear from somebody who had more evidence, that's their job. It's not our job to put on the evidence. It's not our job if there's a video or if you wanted more of an officer, if you had more questions, that's all on them. So if you think, 'Man, I wish I could have heard something more,' that's their responsibility, not ours."

In rebuttal, the State began to discuss the silver teapot story presented by Allen during voir dire:

"[STATE:] Now, it's funny in this case that in jury selection, [defense counsel] referred to the silver tea pot in space, and I never heard that analogy before, but it was something along the lines of the State could claim there was a silver tea pot in space—

    . . . .

"[STATE]:—and it would be my job to [disprove] that, which is impossible. And how that wasn't fair, it wasn't a fair burden. And that's kind of what we have on the

9

intoxication defense. Some random guy in the park gave me some random substance that we don't know what the effects possibly—

"[DEFENSE COUNSEL]: I'm going to object. Can we approach?

"THE COURT: You may.

Then, at the bench with the court and counsel, out of the hearing of the jury, there was the following discussion:

"[DEFENSE COUNSEL]: Your Honor, I think the comments that [the State] is making are starting to shift the burden. I mean, I understand where he's going, but he's talking about the tea pot argument. My argument was about burden of proof. And if he's going to make that analogy on the intoxication, I think the intoxication instruction is pretty clear, it's not a burden shifting type of thing. And I think the direction he's going is shifting the burden towards the defense.

"[STATE]: Your Honor, I think the jury instructions are clear that it doesn't shift the burden and I acknowledged that in closing argument. I'm not attempting to shift the burden.

"THE COURT: You've made that argument. Overrule the objection. Be—make sure you clear up anything. I don't see anything in your argument that was unfair.

"[STATE]: Okay.

"[DEFENSE COUNSEL]: Thank you.

The State then resumed its rebuttal:

"Ladies and gentlemen, again, I'm going to acknowledge the burden of proof is on the State in this case and the evidence suggests that burden has been met. The evidence proves that burden has been met. The evidence shows that this defendant knowingly struck Christopher Buesing, causing great bodily harm, causing harm that's more than mere bruising, trivial bruising. This was great bodily harm and it was caused by this defendant's knowing actions on January 17th, 2017.

"And again, I'm going to ask that you return a verdict of guilty. Thank you."

After deliberations, during the course of which the jury asked to review the video evidence, the jury found Allen guilty of aggravated battery.

The district court imposed a sentence of 162 months in prison with 36 months of postrelease supervision and ordered that the sentence be consecutive to the sentences from two prior cases.

ANALYSIS

Allen presents six claims of error: (1) the district court did not instruct the jury that the State had the burden to disprove his involuntary intoxication defense beyond a reasonable doubt; (2) the State committed prosecutorial error in argument; (3) the district court did not instruct on reckless aggravated battery as a lesser included offense; (4) the district court refused to allow him to present the 911 call log evidence; (5) the district court denied his pretrial motion for a continuance; and (6) cumulative error denied him a fair trial.

*I. State's burden regarding Allen's involuntary intoxication defense*

*Standard of Review*

"When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, i.e., whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Guidance for the first question—preservation of the issue for appeal—is prescribed by statute:

11

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous." K.S.A. 2018 Supp. 22-3414(3).

Allen admits he did not request the jury instruction he now claims was needed to avoid error. If the examination reaches the third step of analysis, therefore, Allen's burden is to demonstrate the failure to give that instruction was clearly erroneous. Before reaching that third part of the analysis, however, we must decide whether error occurred, by considering whether the instruction in question was legally and factually appropriate, using an unlimited review of the entire record. 307 Kan. at 318.

When we apply the clear error standard at the third step because the party now raising the issue did not object to the jury instruction below, we only reverse the district court if an error occurred and we are firmly convinced that the jury would have reached a different verdict if the error had not occurred. The party claiming a clear error has the burden to demonstrate the required level of prejudice. 307 Kan. at 318.

*Discussion*

In 2010, the Legislature adopted K.S.A. 21-5108(c):

"A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies. *Once the defendant satisfies the burden of producing such evidence, the state has the burden of disproving the defense beyond a reasonable doubt.*" (Emphasis added.) L. 2010, Ch. 136 § 8.

Allen relied substantially on the affirmative defense of involuntary intoxication. He testified about his belief that he had unwittingly ingested an unknown intoxicant

contained in a partially smoked cigarillo he got from a stranger. The jury heard circumstantial evidence that could have been considered to support Allen's testimony about this claim. Witnesses for both Allen and the State testified to his odd behavior before and after the attack.

The district court gave the jury the standard burden of proof instruction from PIK Crim. 4th 51.010 (2012 Supp.):

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

The court also gave an instruction based on PIK Crim. 4th 51.050 (2013 Supp.) and 52.040 (2016 Supp.) concerning the jury's consideration of Allen's involuntary intoxication defense:

"The defendant raises involuntary intoxication as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant.

"Intoxication involuntarily produced is a defense if it renders the defendant substantially incapable of knowing or understanding the wrongfulness of his conduct and of conforming his conduct to the requirements of law."

In *State v. Staten*, 304 Kan. 957, 965, 377 P.3d 427 (2016), the Kansas Supreme Court considered K.S.A. 2011 Supp. 21-5108(c) and its impact. A jury convicted Staten of aggravated battery. Staten had made a claim of self-defense at the trial and asserted

13

"the district court committed reversible error by failing to instruct the jury that the State was required to prove beyond a reasonable doubt that he did not act in self-defense." 304 Kan. 962. The district court had given the general burden of proof instruction but gave no further instruction about application of the reasonable doubt standard to the self-defense instruction. He contended the error justified reversal, although he had not made an objection.

Like Allen, Staten argued that for him to be convicted, the district court had to instruct the jury that the State was required to *dis*prove his defense, beyond a reasonable doubt. Unlike this case, in *Staten* the district court gave no instruction based on PIK Crim. 4th 51.050 and Staten neither requested that instruction nor objected to its omission. The Supreme Court considered the 2010 enactment of K.S.A. 21-5108(c) and found:

> "This amendment codified the caselaw requirement that, once a defendant properly asserts a self-defense affirmative defense, the State must disprove that defense beyond a reasonable doubt. See Kansas Criminal Code Recodification Commission's Final Report, Appendix A, Section 21-31-301, Comment (2010). *The amendment did not alter the law in Kansas concerning the State's burden of proof, and it did not create a new element that the State must prove when charging a crime.*" (Emphasis added.) 304 Kan. at 965-66.

The court concluded the district court's failure to give the instruction based on PIK Crim. 4th 51.050 was error, but not clear error:

> "Instructions are clearly erroneous only when the reviewing court is firmly convinced that there is a real possibility that the jury would have reached a different verdict in the absence of the error. In light of the generally correct nature of the instructions as a whole as well as the nature of the evidence supporting Staten's claim of self-defense, we find no basis in the instructions to reverse Staten's conviction. [Citation omitted.]" 304 Kan. at 967.

14

In the present case, the district court avoided the error from *Staten* and *did* give an instruction based on PIK Crim. 4th 51.050, but Allen argues the Supreme Court's reasoning in *Staten* concerning the impact and application of K.S.A. 2011 Supp. 21-5108(c) was flawed. "This court is duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its previous position." *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). The Supreme Court has given no indication it is reconsidering its holding in *Staten* that K.S.A. 2011 Supp. 21-5108(c) did not alter the law relating to the State's burden of proof.

In our view, however, it is Allen's reasoning that is flawed. Allen points to a comment by the court in *May v. Cline*, 304 Kan. 671, 676, 372 P.3d 1242 (2016), that "affirmative defenses (or the lack thereof) are neither elements of the alleged offense nor do they negate any element of the offense. Rather, affirmative defenses provide a legally recognized justification for the action such that the actor cannot be held criminally or civilly liable." From that, Allen reasons the State could prove all the elements of the crime with which he was charged and still fail to disprove beyond a reasonable doubt his involuntary intoxication defense—a "legally recognized justification for the action." Thus, the need for the instruction he now asserts should have been given.

Allen's argument fails, however, in light of the instructions that were given and the verdict that was reached by the jury. Instruction number 2 from the district court to Allen's jury was the standard burden of proof instruction from PIK Crim. 4th 51.010, affirming the State's obligation to prove its case beyond a reasonable doubt. In the following instruction, number 3, the court presented the elements of the crime charged, including the State's duty to prove Allen "knowingly caused great bodily harm to, or disfigurement of" Buesing. Continuing in that same instruction, the district court drew directly from K.S.A. 2016 Supp. 21-5202(i), explaining that "[a] defendant acts knowingly when the defendant is aware of the nature of his conduct or of the circumstances in which he was acting." In instruction number 4, the district court

15

addressed Allen's involuntary intoxication defense and further explained that: "Intoxication involuntarily produced is a defense if it renders the defendant substantially incapable of knowing or understanding the wrongfulness of his conduct and of conforming his conduct to the requirements of law."

In sequence, therefore, the district court's instructions directed the jury to: (1) hold the State to its duty to prove the elements of the crime it charged beyond a reasonable doubt; (2) make the State prove beyond a reasonable doubt that Allen acted knowingly, meaning he was "*aware of the nature of his conduct or of the circumstances* in which he was acting;" and (3) consider Allen's claim that at the time of the crime he was involuntarily intoxicated, which would constitute a defense to the crime if because of involuntary intoxication he was "*substantially incapable of knowing or understanding the wrongfulness of his conduct and of conforming his conduct* to the requirements of law." Our presumption is that the jurors in a case adhere to the instructions given them by the district courts. See *State v. Sisson*, 302 Kan. 123, Syl. ¶ 6, 351 P.3d 1235 (2015) ("It is presumed on appeal that jurors follow the instructions that they receive from the district court.").

By finding Allen guilty, the jury found the State proved Allen's culpable mental state—knowingly—beyond a reasonable doubt. The definition given to the jury for "knowingly" is incompatible with the proposition that involuntary intoxication made Allen "substantially incapable of knowing or understanding" his actions. Therefore, by proving beyond a reasonable doubt that Allen *knowingly* caused Buesing great bodily harm or disfigurement, the State *dis*proved beyond a reasonable doubt Allen's defense that at the time he hit Buesing he was involuntarily intoxicated to the extent he was "substantially incapable of knowing or understanding" his actions.

We find no error by the district court, so we do not reach the question of clear error.

16

*II. Prosecutorial error*

*Standard of Review*

Under the standard articulated in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), we use a two-step process to evaluate claims of prosecutorial error:

"These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' *State v. Sprague*, 303 Kan. 418, 430, 362 P.3d 828 (2015)." 305 Kan. at 109.

*Discussion*

Allen's allegation of prosecutorial error focuses on one portion of the State's argument, when the State made reference to an analogy Allen used in voir dire. The State said:

17

"Now, it's funny in this case that in jury selection, [defense counsel] referred to the silver tea pot in space, and I never heard that analogy before, but it was something along the lines of the State could claim there was a silver tea pot in space . . . and it would be my job to disapprove that, which is impossible. And how that wasn't fair, it wasn't a fair burden. And that's kind of what we have on the intoxication defense. Some random guy in the park gave me some random substance that we don't know what the effects possibly."

At that point, Allen objected and asked to approach the bench. During a brief bench conference Allen argued the State's comments were taking the argument in a direction that would shift the burden of proof toward the defense. The State responded that the instructions concerning the State's burden were clear and denied any attempt to shift the burden. The district court overruled the objection but told the State to "make sure you clear up anything. I don't see anything in your argument that was unfair."

In the State's remaining 40 seconds of rebuttal, counsel said:

"Ladies and gentlemen, again, I'm going to acknowledge the burden of proof is on the State in this case and the evidence suggests that burden has been met. The evidence proves that burden has been met. The evidence shows that this defendant knowingly struck Christopher Buesing, causing great bodily harm, causing harm that's more than mere bruising, trivial bruising. This was great bodily harm and it was caused by this defendant's knowing actions on January 17th, 2017.
"And again, I'm going to ask that you return a verdict of guilty. Thank you."

There is no way to know what the State might have argued if Allen had not interrupted with an objection. But we agree with the district court that at the point of the objection, the State had made no comments that were unfairly outside the bounds of permissible argument. Not only were the instructions clear concerning the State's burden, but Allen timely intervened with an objection, and the State promptly reaffirmed its

18

obligation under the burden of proof. There was no prosecutorial error and, since we find no error, we do not reach the question of prejudice.

## III. Lesser included offense of reckless aggravated battery

### Standard of Review

Allen included an instruction for a lesser included crime of reckless aggravated battery in his proposed instructions. The district court did not incorporate that instruction in its preliminary packet of instructions but, at the instructions conference, specifically asked Allen if he was requesting the lesser included crime instruction. Allen told the district court that he was *not* requesting the instruction. Applying the first step of the *McLinn* analysis, the issue was not preserved for appellate review, so should we find error in the district court's failure to give the instruction, Allen bears the burden of demonstrating the omission of that instruction was clearly erroneous. *McLinn*, 307 Kan. at 317-18.

At the second step, we consider whether there was error in failing to give the instruction. To do so, we must decide whether the instruction was legally and factually appropriate, using an unlimited review of the entire record. 307 Kan. at 318.

### Discussion

The State charged Allen with aggravated battery with a *knowing* culpable mental state under K.S.A. 2016 Supp. 21-5413(b)(1)(A). A lesser degree of aggravated battery with a reckless culpable mental state is defined in K.S.A. 2016 Supp. 21-5413(b)(2)(A). Other than the required culpable mental states—knowingly in (b)(1)(A) and recklessly in (b)(2)(A)—the two crimes are identical in all respects.

19

The relationships between culpable mental states are described in the statute:

"Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged. *If recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally.* If acting knowingly suffices to establish an element, that element also is established if a person acts intentionally." (Emphasis added.) K.S.A. 2016 Supp. 21-5202(c).

Because sufficient proof that a person acted knowingly is, statutorily, also sufficient for a crime requiring a reckless mental state, the instruction for the lesser included crime of reckless aggravated battery is legally appropriate.

Next, we have to consider whether an instruction on a lesser offense of reckless aggravated battery was factually appropriate.

"When an appellate court considers the factual appropriateness of a lesser included offense instruction, the determination is guided by the standard in K.S.A. 22-3414(3). As this court explained in *Williams* [*State v. Williams*, 295 Kan. 506, 521-22, 286 P.3d 195 (2012)]:
"'[T]he giving of lesser included crime instructions is not a matter of discretion with the trial judge. K.S.A. 22-3414(3) directs that "where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . , the judge *shall* instruct the jury as to the crime charged and any such lesser included crime."' (Emphasis added.) 295 Kan. at 521-22." *State v. Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014).

Under that standard, we first consider whether there was "some evidence" that would justify the jury to find involuntary intoxication was not a defense and Allen acted recklessly, rather than knowingly.

"A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will

20

follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2016 Supp. 21-5202(j).

In the version of events Allen gave at the scene, both he and Buesing came around a corner and collided. At trial, Allen testified he was hallucinating, frightened, and trying to avoid the things he was seeing. Conceivably, a jury could accept Allen's testimony about being given a cigarillo that contained some hallucinogenic substance, then find that a reasonable person who realized he or she was in that situation would obtain and follow through with help. Since Allen failed to do that, he disregarded a substantial and unjustifiable risk of bad consequences, grossly deviating from the standard expected from a reasonable person.

Our role is not to decide the likelihood of that finding, but whether some evidence at the trial could reasonably support recklessness. Accordingly, we find the district court erred in failing to instruct on the lesser charge of reckless aggravated battery.

For the error to be reversible, Allen must firmly convince this court that the jury would have reached a different verdict if the error had not occurred. Allen argues that there was doubt surrounding his mental state and a jury would have convicted him of the lesser included crime if the instruction had been given. Allen does not point to specific evidence in the record to support this argument.

The record contains substantial evidence that Allen acted not just knowingly but intentionally. Video evidence showed Allen directly approaching and lunging at Buesing to punch him. At the scene, immediately after he had hit Buesing, Allen claimed to have run into Buesing accidentally as they both rounded the corner and that Allen was there to wait on his friend "Snoop." Then, at trial, Allen claimed he had gone into that building because he wanted to feel safe and was trying to defend himself from "demonic looking" faces he was seeing come at him when he turned and saw Buesing, and he did not know he had hit him.

21

The evidence and arguments presented by the State supported a conclusion that Allen intentionally or knowingly battered Buesing and caused great bodily harm and disfigurement. The version of events and the explanations presented by Allen supported his involuntary intoxication defense. Allen simply asserts, without analysis, that because of the "doubt surrounding [his] mental fitness on the day in question," it is "likely" or "highly likely" the jury would have chosen a conviction for the lesser included crime of reckless aggravated battery.

Although a reasonable jury *could have* convicted Allen of reckless aggravated battery under these facts, we are not firmly convinced the jury *would have* chosen the lesser offense if the instruction had been given. The jury's rejection of Allen's involuntary intoxication defense suggests the jury did not have the degree of doubt about Allen's mental fitness that Allen posits. The district court's error in failing to instruct on the reckless level of aggravated battery did not meet the standard for clear error.

*IV. Allen's offer of 911 call logs during State's case-in-chief*

*Standard of Review*

A district court has broad discretion to manage litigation decisions regarding control of trial proceedings, which are reviewed for abuse of discretion. *State v. Herbel*, 296 Kan. 1101, 1115-16, 299 P.3d 292 (2013).

A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015); *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

22

*Discussion*

At a bench conference before cross-examining Officer Thompson during the State's case-in-chief, Allen's counsel told the judge he wanted to introduce a 911 call log. The State said it would stipulate to foundation for the log, waiving the presence of any records custodian but did object to relevance because it was "getting into mental health issues." Allen agreed the State had said previously it would waive any foundation objection.

The court then asked about the nature of the evidence and Allen's counsel said the log would show the defendant "had been to Valeo before, and . . . that he had been released" and it also mentioned he would "be wandering around in the area and they expect that there may be additional calls." The court asked whether Thompson had any personal knowledge of that evidence and Allen's counsel acknowledged he did not. The district court told Allen if he wanted the evidence admitted, it would have to come through a different witness in Allen's case-in-chief. Allen attempted to remind the district court of the State's waiver of any objection based on foundation—that is, requiring the "right" witness to authenticate the record—but the court persisted that the log would need to be offered in Allen's case-in-chief. Allen did not renew his attempt to admit the evidence during his case-in-chief.

At the heart of this issue is a miscommunication between counsel and the district court during a bench conference between direct and cross-examination during the trial. Under those circumstances, addressing one of the innumerable decisions required of a district judge conducting a jury trial—while, in this instance, keeping the jury from hearing the discussion—getting the wires crossed, so to speak, is not surprising. The court appeared to be principally concerned that the witness on the stand was not a proper witness to provide the foundation for the evidence Allen wanted to introduce, although both the State and Allen had said foundation was not an issue.

23

Nevertheless, the district court's ruling that the evidence should come in during Allen's case-in-chief, rather than the State's, was correct. Since the witness on the stand was not needed to lay the foundation for the document, there was no basis for Allen to offer the evidence when he did. He should have offered it in his case-in-chief, without a witness, since foundation was not a problem. The State's relevance objection then could have been made and decided. "Although the reasons for our decision differ from those of the district court, an appellate court can affirm the district court if the court was right for the wrong reason." *State v. Ryce*, 303 Kan. 899, 964, 368 P.3d 342 (2016), *aff'd* 306 Kan. 682, 396 P.3d 711 (2017). Therefore, we find no abuse of discretion.

*V. Denial of motion to continue trial*

*Standard of Review*

"The trial court has discretion to grant or deny continuances. An appellate court will not disturb the trial court's ruling unless the defendant can show that the trial court abused its discretion and prejudiced his or her substantial rights. Judicial discretion is abused when no reasonable person would adopt the position taken by the trial court. [Citation omitted.]" *State v. Ly*, 277 Kan. 386, 389, 85 P.3d 1200 (2004).

K.S.A. 22-3401 allows a district court to grant a continuance of a trial "for good cause shown."

When, as in this case, a defendant claims the denial of a continuance interfered with his or her ability to present a defense, we review the question de novo. *State v. Johnson*, 304 Kan. 924, 945, 376 P.3d 70 (2016); *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015), *cert denied* 137 S. Ct. 164 (2016).

*Discussion*

On July 11, 2017, Allen filed a motion for a continuance of the trial based on the failure to receive medical records in response to a business records subpoena. At a hearing on the motion on July 14, Allen's trial counsel elaborated on the written motion, saying the case was going to be about Allen's state of mind and he expected the records would reveal the names of witnesses to Allen's intake at Valeo after the incident and others who may have been involved in Allen's contact with Valeo earlier that same day.

The State opposed the motion to continue, announced it was ready for trial, and contended the information Allen was trying to find appeared to be in support of a defense based on mental disease or defect although Allen had not filed the statutory notice required for that defense. Allen responded that he was not asserting that defense but did intend to pursue an intoxication defense.

The district court expressed concern about the timing of the motion and observed that a pretrial conference was held in early June and the problems were not mentioned at that time. After considering the arguments from both sides, the court concluded there was not good cause for the continuance and denied Allen's motion.

As we note above, in *Ly*, our Supreme Court recognized the need for broad discretion in the scope given a district judge to control pretrial and trial proceedings. The district judge is simply in the best position to make those decisions. Appellate review, therefore, is designed to protect a defendant's rights, but to give deference to the circumstances known to the district judge trying the case, factors that may not be readily apparent in an appellate record. In that vein, the court in *Ly* said: "A defendant cannot establish prejudice from the trial court's denial of his or her motion for a continuance for the purposes of investigating evidence if he or she fails to investigate the evidence after the trial and submit any new evidence in a motion for a new trial." 277 Kan. 386, Syl. ¶ 2.

25

After the district court denied the motion, Allen continued to have the subpoena and contempt powers of the district court at his disposal through the time for posttrial motions. The record, however, reveals no further information about witnesses or other evidence that could have been obtained had the district court granted the continuance. At the time of the hearing on the motion to continue, Allen spoke only in generalities about the sources from which he expected to get records and names of witnesses who, in turn, might—or, of course, might not—provide information important to his defense.

The record does not show whether there was further investigation of those sources. If there was, it did not appear in posttrial motions as *Ly* requires. Applying the sound guidance from *Ly*, we cannot speculate about what *might* have been discovered if a continuance had been granted and we do not find that no reasonable person would have taken the position adopted by the district court. There was no abuse of discretion in the denial of the motion to continue the trial.

*Cumulative error*

*Standard of Review*

"'This court utilizes a de novo standard when determining whether the totality of circumstances substantially prejudiced a defendant and denied the defendant a fair trial based on cumulative error.'" *State v. Anderson*, 308 Kan. 1251, 1266, 427 P.3d 847 (2018) (quoting *State v. Brown*, 298 Kan. 1040, 1056, 318 P.3d 1005 [2014]).

*Discussion*

"'In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their

interrelationship, if any; and the strength of the evidence.' *State v. Tully*, 293 Kan. 176, 205-06, 262 P.3d 314 (2011)." *State v. Williams*, 308 Kan. 1439, 1462, 430 P.3d 448 (2018).

Here, Allen has shown error in failing to give a lesser included crime instruction, but the error did not rise to the level of clear error. The other alleged errors, even if assumed to be actual errors, do not sufficiently overlap or create a cumulative effect on the jury's consideration. The State's evidence was strong in this case and included undeniable video footage of the crime and the defendant's behavior immediately after the crime. We find no basis to conclude Allen was prejudiced by cumulative error.

Affirmed.